**Richard T. PRATT, Ladd Christensen and Evergreen Investment, Ltd., Plaintiffs,**

v.

**HERCULES, INC., Defendant.**

No. C 80–0582A.

United States District Court, D. Utah, C.D.

May 4, 1982.

Richard W. Casey, and Jay D. Gurmankin, Salt Lake City, Utah, for plaintiffs.

Keith E. Taylor, Salt Lake City, Utah, for defendant.

## MEMORANDUM OPINION SUPPORTING PARTIAL SUMMARY JUDGMENT

ALDON J. ANDERSON, Chief Judge.

### BACKGROUND FACTS

This action was originally filed in the Third Judicial District Court for Salt Lake County, State of Utah, claiming jurisdiction over the defendant under Section 78–27–24, U.C.A. (1953), as amended. Defendant Hercules removed the case to this court pursuant to 28 U.S.C. Section 1446, claiming jurisdiction under 28 U.S.C. Section 1332.

Plaintiffs Richard T. Pratt and Ladd Christensen hold graduate degrees in Business Administration. Plaintiff Evergreen Investment, Ltd., is a limited partnership established for the benefit of the wife and children of A. Blaine Huntsman, Jr. Mr. Huntsman holds a Ph.D. in economics. At the time of the purchase of the property now in dispute, Mr. Huntsman was the general partner of Huntsman/Evergreen Investment, Ltd. He is no longer involved in the limited partnership, nor is he a party to the suit. The plaintiffs have extensive experience in purchasing and developing real estate.

Defendant Hercules is a corporation of the state of Delaware and maintains its principal place of business in Wilmington, Delaware. As a multi-national company it manufactures a diverse line of explosives, rocket fuels, insecticides and other chemical products. In 1913 Hercules, Inc. purchased property for its Utah operations in what was then the remote western portion of Salt Lake Valley. (Unless indicated to the contrary, the name Hercules as used hereinafter will refer solely to its Utah operations, which are named the Bacchus Works.) At present the manufacturing facility is spread over some 2,970 acres, of which Hercules owns 2,450 and the United States owns the remaining 520 acres. Defendant relates without contest that the United States Navy established a Naval Industrial Reserve Ordnance Plant (NIROP) on federal property within the Hercules facilities in 1960. Manufacturing processes involved in the manufacture of the Trident missile system are carried on jointly on both NIROP and Hercules property by Hercules and employees. At the Bacchus Works Hercules is a first-tier contractor in the Trident I, Pershing II and MX missile programs. There is no dispute that through the exercise of its constitutional authority to establish the political policy governing national defense and military appropriations, Congress has determined that the advancement of the missile programs is critical to the national defense of the United States. Defense contracts for the construction of these missiles must meet specific safety standards and operational requirements established by the Department of Defense Explosive Safety Board (DDESB). In addition to meeting these mandatory standards, Hercules has voluntarily met higher safety standards in certain areas of the manufacturing process. The United States is the only one who can modify compliance with safety standards after a project has begun. There is no indication that the United States has attempted to do so.

In 1977 the plaintiffs purchased either outright or an option on approximately 183 acres of land lying to the north of the Hercules plant. At that time the land was zoned for agricultural use. Shortly after purchase the plaintiffs were successful in securing a rezoning of 93 acres for residential development and 90 acres for light industry. Thirty-six acres of the land rezoned for residential use were thereafter developed by the construction of 150 homes. Defendant Hercules had objected to the proposed change in zoning.

Apparently immediately prior to the time that plaintiffs' land was rezoned, the Salt Lake County Planning Commission asked defendant Hercules to provide it with detailed information relative to the type and degree of hazard that its operations presented to adjoining landowners. The duties of the Planning Commission most important in this case deal with zoning.

17–27–9. *Planning commission—Zoning—Right to regulate.*—The county planning commission of any county may, and upon order of the board of county commissioners in any county having a county planning commission, shall make a zoning plan or plans for zoning all or any part of the unincorporated territory within such county, . . .

Section 17–27–9 U.C.A. (1953). (The Salt Lake County Planning Commission will hereinafter be referred to as the "Zoning" Commission to indicate its pertinent activities.) In April of 1980 Hercules submitted the requested report analyzing the risks of damage to the structures and persons on adjoining property. This report recommended that despite the fact that there were still some fifty-seven acres still zoned for residential use, future development of land not be permitted. The court has not been given any evidence of any formal action taken by the Zoning Commission or County Commissioners of Salt Lake County relative to the recommendations made by Hercules or on any request by the plaintiffs to allow further building.

Plaintiffs' complaint alleges eleven causes of action. These actions can be characterized within three basic categories. *First,* due to the hazard and risk associated with the manufacture of high-explosive rocket motors and other military hardware, the defendant's operation constitutes a public and private nuisance. *Second,* the existence of this hazard and the high risk of explosion constitute an ultrahazardous activity and strict liability should be imposed for all damages that flow therefrom. *Third,* there are four related causes of action which deal with representations made by Hercules to the Zoning Commission which allegedly were fraudulent and damaged the plain-tiffs. The plaintiffs claim they have been damaged because "the value of plaintiffs' property, being held for investment purposes, has been greatly impaired, significantly damaging plaintiffs' opportunity to resell the property for residential and industrial purposes." (Amended Complaint, Para. 26.) There is no allegation that an explosion or any actual trespass on the plaintiffs' property by concussion or otherwise has occurred. It is also uncontested that the non-governmental work performed by Hercules at the plant does not involve explosive material in any way.

Hercules has filed two motions for summary judgment. After the first motion was filed, plaintiffs amended their complaint to include charges of negligence, ultrahazardous operations, and misrepresentations before the Zoning Commission.

The court has heard arguments on both motions and has reviewed in detail all of the memoranda, affidavits, depositions and accompanying exhibits submitted to the court. As a result of this review the court is convinced that except for the last four claims of misrepresentation the claims of plaintiffs will not stand, whether viewed under state or federal law.

## UNDISPUTED FACTS

The Tenth Circuit has placed in proper perspective the singular importance of undisputed facts in motions for summary judgment.

Summary judgment must be denied if a genuine issue of material fact is presented to the trial court. *Exnicious v. United States,* 563 F.2d 418, 423 (10th Cir.1977). In making this determination, the evidence must be viewed in the light most favorable to the party opposing the motion. *National Aviation Underwriters v. Altus Flying Service, Inc.,* 555 F.2d 778, 784 (10th Cir.1977). Thus, summary judgment should be denied if inferences can be drawn from conflicting evidence. *Madison v. Deseret Livestock Co.,* 574 F.2d 1027, 1036 (10th Cir.1978).

*Ruhs v. Pacific Power & Light,* 671 F.2d 1268 at 1270, (10th Cir.1982). In accord with this direction, the court will outline the undisputed and critical facts used by the court in granting defendant's motions for summary judgment.[1]

As noted earlier, plaintiffs' amended complaint may be divided into three basic categories of causes of action relative to nuisance, ultrahazardous operations and fraudulent misrepresentation. The court has decided relevant questions in the first two categories under Utah and federal law. The last category has been considered solely as a matter of state law.

Defendant Hercules has claimed, *inter alia,* that plaintiffs' state causes of action relative to nuisance should be dismissed by reason of Section 78–38–5 and Section 78–38–6, U.C.A. (1981). Notwithstanding plaintiffs' arguments to the contrary, this court has found as a matter of law that the new statutes apply to this case. However, in accord with the new legislation, plaintiffs have attempted to demonstrate the possibility that Hercules has either (1) expanded operations since 1977 when their property was purchased or (2) negligently operated the manufacturing operations. A serious dispute as to either of these facts would prevent the court from applying the new legislation at this stage of the proceedings.

The court does not find plaintiffs' effort to place the question of Hercules' expanding operations in dispute sufficient for two reasons. First, aside from general pleading based on information and belief, (Amended Complaint, Paras. 23, 35), the evidence of Hercules expanding its operations was only mentioned in oral argument on October 7, 1981. Counsel summarized statements he had allegedly recently read in the transcript of a second deposition taken of Ernest A. Mettenet, Jr. (Transcript of Oral Argument, October 7, 1981, at 39–40). (Hereinafter referred to as T.R.) However, this second deposition has not been filed with the court. The court may not take hearsay representations made by counsel in oral argument as being true for purposes of summary judgment. A statement by counsel in oral argument is not sufficient to place facts in dispute for purposes of a motion for summary judgment. Second, even if the sum effect of all "discovered material," (including all material in plaintiffs' possession but not yet before this court,) is accepted as characterized by plaintiffs' lead counsel in correspondence requested by the court after oral argument, plaintiffs' conclusions as to the significance of such material are insufficient as a matter of law to raise the issue of expansion of operations of Hercules for the purposes of this motion.

Similarly, the bare assertions by counsel at oral argument as to the factual foundation of Hercules' alleged negligence fails to raise a disputed question of fact for purposes of this motion. Even if the court were to accept plaintiffs' assertions that Hercules was negligent by failing (1) to maintain an adequate buffer zone around its operations and (2) to carry out its operations in such a manner as to safeguard adjacent property owners against the danger of explosion, (T.R. at 28), Hercules' undisputed compliance with the *minimum* safety standards outlined by the DDESB (Department of Defense Explosive Safety Board), 32 C.F.R. Section 186, 10 U.S.C. Section 172 (1956), compels the conclusion that as a matter of federal law no negligence, as pled by plaintiffs, exists.[2] The

---

1. As observed by the movant and tacitly accepted by plaintiffs, defendant's motions are more analogous to motions to dismiss. However, as observed by movants, the parties have relied upon facts outside the record and hence the motions were cast as motions for summary judgment.

2. It is important to recognize that the court has not made any effort to determine if the NIROP portion of the manufacturing operations are in compliance with the DDESB requirements. It has not done so for two reasons. First, the United States and the NIROP are not formal parties. Plaintiffs have not raised any specific question as to compliance by the NIROP with DDESB standards. Second, and more dispositive, recent Supreme Court precedent prevents this court from doing so. In *Weinberger v. Catholic Action of Hawaii,* 454 U.S. 139, 102 S.Ct. 197, 70 L.Ed.2d 298, 1981, the Supreme Court found

fact that plaintiffs purchased their property adjoining the Hercules operations long after Hercules had been in existence compels a similar conclusion for a variety of reasons under Utah law.

In all events, even if Section 78–38–5 and Section 78–38–6 were not applicable to the instant case, this court finds as a matter of law that under the *unamended* Section 78–38–1, *et seq.,* U.C.A. (1953) plaintiffs have failed to indicate that the actions of Hercules have been unreasonable or that plaintiffs' rights have been substantially invaded. Therefore, even accepting plaintiffs' pleadings as true, plaintiffs have failed to state a public or private nuisance upon which relief can be granted.

In addition to failing to state a claim of nuisance under Utah law, the court has found that several undisputed facts provide the basis for determining that federal law also bars plaintiffs' claim of nuisance. The four undisputed facts relied upon by the court in making that determination are:

1. The siting requirements that Hercules and the Naval Industrial Reserve Ordnance Plant (NIROP) were required to follow by the Department of Defense Explosive Safety Board (DDESB) were promulgated pursuant to the specific constitutional powers given Congress in Article I, Section 6, Clause 17 as articulated in 10 U.S.C. Section 172. (*McQueary v. Laird,* 449 F.2d 608 [10th Cir.1971].)

2. Hercules has complied with the minimum siting requirements promulgated by the DDESB in accord with its statutory and regulatory requirements. (*See* Section IB, *infra.*)

3. No explosion has occurred by reason of the manufacturing operations at Hercules-NIROP since plaintiffs' purchase of their property.

4. Hercules and NIROP have integrated manufacturing operations on property owned by each of them individually. (Mettenet Affidavit, para. 7.)

By reason of these undisputed facts, the court has found as a matter of federal law that (1) plaintiffs' request for declaratory and monetary relief by reason of defendant's nuisance is barred by reason of absolute and derivative sovereign immunity and (2) defendant's claim of derivative sovereign immunity as explained in this opinion must stand. Absolute sovereign immunity similarly prevents this court from issuing the injunctive relief also sought by plaintiffs.

The court has based its legal conclusion that plaintiffs have failed to state a claim as to the liability of Hercules resulting from the ultrahazardous operations conducted by Hercules-NIROP on the following four, undisputed facts.

1. There has been no explosion at Hercules-NIROP since the plaintiffs purchased their property.

2. Hercules and NIROP have integrated manufacturing operations on property owned by each of them individually. (Mettenet Affidavit, para. 7.)

3. Title to all ultrahazardous materials used in the manufacturing process

---

[u]ltimately, whether or not the Navy [NIROP] has complied with the NEPA [DDESB] "to the fullest extent possible" is beyond judicial scrutiny in this case. In other circumstances, we have held that "public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated." *Totten v. United States,* 92 U.S. 105, 107 [23 L.Ed. 605] (1875). See *United States v. Reynolds,* 345 U.S. 1 [73 S.Ct. 528, 97 L.Ed. 727] (1953). We confront a similar situation in the instant case.

*Id.* 454 U.S. at 146, 102 S.Ct. at 203. As constitutionally recognized public policy favoring national security prevents the Supreme Court from investigating the degree to which the Navy complied with the requirements to file an environmental impact statement, *a fortiori,* this court cannot explore the likelihood that the NIROP has complied with regulations formulated by the DDESB pursuant to a discretionary grant of power by Congress, *McQueary v. Laird,* 449 F.2d 608, 610, 612 (10th Cir.1971). This is especially true as the regulations are designed for internal use by the Department of Defense (DoD) to eliminate undue risk of injury arising from manufacturing conducted pursuant to DoD contracts.

lies in the government. (Mettenet Affidavit, para. 9; MacPherson Affidavit, para. 5.)

4. Plaintiffs purchased the property after Hercules had begun manufacturing rocket motors and use of ultra-hazardous materials.

Based on these facts, the court has found as a matter of law that plaintiffs have failed to state a claim upon which relief can be granted under Utah law. As a matter of federal law, absolute sovereign immunity bars plaintiffs from bringing this action.

Upon analysis of Utah law, which follows hereinafter, the court will deny defendant's motion for summary judgment as to the

final four causes of action dealing with alleged fraudulent misrepresentation.

For all of the foregoing reasons, the court finds that with respect to the issues disposed of there are no disputed facts,[3] or inferences therefrom, that would prevent this court from reaching the legal conclusions outlined below. Any additional discussion of "facts" in the body of the opinion similarly appear to this court to be "undisputed," but are not in and of themselves critical in reaching the legal conclusions and result announced hereafter.

## ANALYSIS

I. Given the circumstances of defendant's operation, under applicable Utah

---

[3]. Defendant Hercules, Inc., submitted an affidavit and exhibit which claimed that the Trident I, MX and Pershing II missile contracts being completed at the Hercules-NIROP facilities are "critical to the national defense," Affidavit of Commander G.W. MacPherson, USN, November 14, 1980, para. 7, as they are necessary "for the Navy to meet its national security commitments." Letter of Commander C.F. Wendt, USN to Mr. Carl Dinus, Federal Housing Administration [Salt Lake City] Office, May 6, 1977, Deposition of Ladd E. Christensen, Exhibit 35, Appendix E, May 14, 1981. Were this court to accept these assertions as undisputed facts it would dismiss plaintiffs' first seven claims in light of the constitutional mandate to provide for the common defense and the supremacy of the federal Constitution. See Hamilton, The Federalist Papers, No. XXIII; M'Culloch v. Maryland, 4 Wheat (17 U.S.) 316, 406, 4 L.Ed. 579 (1819). However, for purposes of summary judgment, statements by military personnel based on their own knowledge or that of DoD contractors are not sufficient to establish an undisputed fact that certain manufacturing operations are "critical to national defense" because of "national security commitments."

War and its attendant preparations are merely physical manifestations of political judgments and policies. von Clausewitz, K., War, Politics and Power, trans. Collins, selections from On War and I Believe and Profess at 81–83 (1967). The framework of our civilian directed, constitutionally controlled military presupposes this nation's military power is directed and supervised by those responsible for formulating, executing and reviewing political judgments. It is manifest, therefore, that only the political entities so empowered by the Constitution may decide as a question of fact whether a program is "critical to national defense." Even so, political determinations of

present need are not dispositive as to future need. A future "meeting of national security commitments" may occur when on-going defense programs are abandoned because of a legislative determination that such operations no longer further newly defined political objectives. Therefore, absent evidence of political determination, this court need not recognize as being legally operative the conclusions of military officers that particular programs are necessary to achieve national security objectives.

The constitutional dominance of political control and the ofttimes conflicting loyalties of military personnel does not ipso facto invalidate the credibility of such individuals when testifying before a congressional committee or executive task force that a particular project or military mission could be or continue as an effective means of achieving certain political objectives. See Flammer, "Conflicting Loyalties and the Military Ethic," 19 American Behavioral Scientist 589 (1976); Flammer, "The Military Critic," 101 Proceedings 28 (March 1973). It is the very weighing of such sensitive testimony during the enactment of legislation or prior to issuing an executive order, followed by judicial recognition of such political determinations, which establishes as a matter of law the undisputed fact that a present program or mission is "critical to national defense" and supportive of "national security commitments." In this case the joint effort of Congress and the President as reflected in 10 U.S.C. Section 172 and 32 C.F.R. Section 186 et seq. provides the necessary political determination that those manufacturers complying with DDESB regulations have in fact, as a matter of law, while carrying out works critical to the national defense, thus eliminated "undue risk" as to adjoining landowners. Hence, this determination eliminates as a matter of federal law plaintiffs' claim of cognizable injury under Utah nuisance law.

statutes have plaintiffs stated a cause of action this court can hear in diversity?

A. Application of current Utah law to the claim of public and private nuisance, under the facts established, provides no basis for this court's exercise of diversity jurisdiction.

After this lawsuit was filed in 1981, the Utah Legislature passed Section 78–38–5, *et seq.*, which effectively eliminated any common law cause of action for a nuisance against a manufacturer which had been in existence for three years or more, and was not a nuisance during that time period. It is undisputed that Hercules clearly comes within the broad definition of "manufacturing facility" contained in the law. Section 78–38–6, U.C.A. (1981). The plaintiffs' original claim of nuisance was filed under Section 78–38–1, U.C.A. (1953).

Section 78–38–5 indicates that

(1) Notwithstanding sections 78–38–1 and 76–10–803, no manufacturing facility or the operation thereof shall be or become a nuisance, private or public, by virtue of any changed conditions in and about the locality thereof after the same has been in operation for more than three years when such manufacturing facility or the operation thereof was not a nuisance at the time the operation thereof began; provided, the manufacturing facility does not increase the condition asserted to be a nuisance and that the provisions of this subsection shall not apply whenever a nuisance results from the negligent or improper operation of any such manufacturing facility.

(2) The provisions of subsection (1) of this section shall not affect or defeat the right of any person to recover damages for any injuries or damage sustained on account of any pollution of, or change in the condition of, the waters of any stream or on account of any overflow of the lands of any person.

(3) Any and all ordinances now or hereafter adopted by any county or municipal corporation in which such manufacturing facility is located, which makes the operation thereof a nuisance or providing for an abatement thereof as a nuisance in the circumstances set forth in this section are null and void; provided, however, that the provisions of this subsection shall not apply whenever a nuisance results from the negligent or improper operation of any such manufacturing facility.

The passage of this law raised two issues. First, did the Utah Legislature intend to apply the provisions of Section 78–38–5 to cases in the posture of this one? Second, did the passage of the act comport with relevant constitutional and statutory requirements of Utah law? An answer to these questions will assist the court in deciding if it can assume jurisdiction over the claims under controlling state law.

1. Did the Utah Legislature intend the limitations of Section 78–38–5 to apply to the instant case?

This initial issue must be analyzed from two viewpoints. First, did the Utah Legislature intend Section 78–38–5 to apply to Hercules? Second, did the Utah Legislature intend that application to occur in this litigation between plaintiffs and defendant Hercules? This court finds that the legislative history indicates a clear intent to apply Section 78–38–5 to Hercules in the present litigation. There is no dispute about this fact.

a. Did the Legislature intend Section 78–38–5 to apply to Hercules?

An examination of the language of Section 78–38–6 and debates in the Utah House clearly indicate that this bill was intended to apply to Hercules. Section 78–38–5 was to apply to a "manufacturing facility" which has been in operation for more than three years. Section 78–38–6 defines "manufacturing facility."

As used in this act, "manufacturing facility" means any factory, plant, or other facility including its appurtenances, where the form of raw materials, processed materials, commodities, or other physical objects is converted or otherwise changed into other materials, commodities, or physical objects or where such

materials, commodities, or physical objects are combined to form a new material, commodity, or physical object.

■ It is obvious that Hercules' operation comes within this definition. The bill was passed by the Senate on the consent calendar with no mention of its application to Hercules. However, Representative Harmer, sponsor of the bill in the Utah House, indicated in his opening address that it was to apply to, *inter alia,* Hercules.

> Senate Bill 226 is a bill which is designed to protect manufacturing facilities from nuisance lawsuits, and protect their basic property rights, based on the duration they have been in that particular state.
>
> \* \* \* \* \* \*
>
> [T]his bill covers such manufacturing as Kennecott, the smelter, refinery and the mill. U.S. Steel at Geneva. Hercules, Thiokol, Sperry, National Semiconductor. Those types of manufacturing facilities.

(Transcript of Proceedings of the Utah House at 2–3, hereinafter referred to as HP.)[4] The clear intent of the Legislature, as evidenced by the express provisions of Section 78–38–6 and the legislative debates, indicates that this bill was to apply to Hercules.

**b. Did the Utah Legislature intend that Section 78–38–5 apply to the instant case?**

An examination of the clear provisions of Section 78–38–5 and the legislative debates in both the Senate and House of the Utah Legislature give clear indication that the bill was intended to be applied in the instant case.

**(i) The intent to remove jurisdiction is evident on the face of the bill.**

■ The intent of the Utah Legislature to remove jurisdiction in this case is evident

in the express language of Section 78–38–5 in three different ways. First, relevant language in the statute indicates that

> no manufacturing facility or the operation thereof *shall be* or *become* a nuisance, private or public, by virtue of any changed condition in or about the locality thereof after the same has been in operation for more than three years when such manufacturing facility or the operation thereof was not a nuisance at the time the operation began.

Section 78–38–5 (emphasis added). The phrase "shall be" clearly denotes a present application. Inasmuch as it is the court that determines when a manufacturing operation is a nuisance, the present denial of the right to determine that something is, or at the *present,* constitutes a nuisance, removes the jurisdiction of the court to do so. Second, paragraph three of Section 78–38–5 provides that "*any and all ordinances now or hereafter* adopted by any county or municipal corporation in which such manufacturing facility is located," in conflict with the provisions of the act, "*are null and void.*" The court knows of no principled distinction, absent allegations of a deprivation of alleged constitutional rights, that would allow individuals to seek legal relief against the manifest intent of the Legislature when all local ordinances contrary to that intent are, by law, *null* and *void.* Third, there is no enabling provision in the bill that indicates its implementation is to be held in abeyance. Therefore, the bill becomes effective as soon as the statutory waiting period on all bills has run.[5] For these three reasons, there is no question that the express intent of the Legislature was to insure that the provisions of Section

---

**4.** A copy of the debates in the Utah House on Senate Bill 226 was transcribed from a voice record kept by the Utah House for the benefit of the court and used with the consent of counsel. (The transcripts are part of the record in this case. See minute entry of May 4, 1982, and documents in File # 5, at pages numbered 70a, b, c, d and e.) Other speakers who made specific reference to Hercules in the debates included Representatives Reese, Free, Redd,

Palmer, Maxfield and Rogers. Aside from procedural motions, only Representatives Lerdahl, Christensen, Curran and Fox spoke without specifically mentioning Hercules. The bill passed the Utah House 57–6. It had been passed earlier on the Utah Senate consent calendar.

**5.** *See* Section 20–11–5, U.C.A. (1953).

78–38–5, U.C.A. (1953) be made applicable to all nuisance-related ordinances *and* legal actions *not in harmony with the express and implied intent* of the statute.

> (ii) The intent to eliminate nuisance causes of action of the type in question is evident from the legislative debates in the House and Senate.

■ Senator Barton's one paragraph explanation of S.B. 226, prior to its passage by consent in the Utah Senate, indicates an intent that jurisdiction not be maintained in the instant case. He indicated the bill

> very strictly stipulates that manufacturing firms, that have been in business for three years or more that do not expand their operations nor change their operations in any great extent, *cannot* be declared a nuisance.

(Transcript of Senate Proceedings at 1, emphasis added.) This language—*cannot*—is direct, complete and clear. One way to insure that such operations not be declared a nuisance is for the Legislature to define the situation in question as not a nuisance and thus preclude a court from considering it.

The discussion of the bill by the Utah House of Representatives indicates with similar clarity that the courts would have no jurisdiction where it related to nuisance actions against the designated class of manufacturers. Discussion focused on the problems caused Hercules by nuisance lawsuits. Representative Free indicated that nuisance suits would have to be removed as to Hercules.

> People that have been there for a long, long time, and then some Johnny-Lately comes in next door and immediately starts to evict the permanent resident that has been there for a long time. This is exactly the same thing is true with a manufacturer. He comes to this area, he provides us with jobs, provides for the better economy and a well being of this state, and if we do not protect him from this sort of harassment we will move manufacturers out of this state.

> Hercules' name has been thrown to us. Hercules, if they are going to have to put up with consistent, persistent nuisance suits and so forth, will eventually move to Texas, as will a lot of other manufacturers, and this will be a very important factor in bringing industry which we badly need into this state. I urge your support of this bill.

(HP 7)

Speaking to an amendment designed to change the requirement of three years' residency to five, the relevance of concern over *pending* and future actions became clearer. Representative Reese spoke against the amendment noting that "[t]his is a grave situation which we have got out here on the west side of the [Salt Lake] Valley [where Hercules is located], and people who are talking against it don't live in the Valley." (HP at 17.) A reasonable inference from this language, taken in the light of the other comments, is that it referred specifically to Hercules. Speaking more broadly, Representative Harmer, sponsor of the bill in the House, addressed the nuisance lawsuit problem as it related to the state's efforts to attract manufacturers in the future.

> [W]hen we are trying to attract industry to come into this state and you tell them that they are on their own for five years after they select a site—over three years—that's two more years they have to live with opportunists, and any time a new industry goes in it's prospect for commercial and residential development around it in order to provide facilities for the employment that the industry needs, and two years may not seem like a long time, but it only takes an opportunist with a nuisance lawsuit ten minutes to create a lawsuit and create that opportunist lawsuit. . . .

(HP at 17–18.) These representative comments of legislators, coupled with the clear indications in the language of the bill, compel the conclusion that the Utah Legislature intended that the provisions of Section 78–38–5 apply to the instant case.

2. Is there precedent in Utah law for concluding that the Utah Legislature's intent to remove subject matter jurisdic-

tion over nuisance actions against manufacturers such as Hercules is tantamount to removing jurisdiction over the action?

■ It is clear under Utah law that by removing subject matter jurisdiction, a statute effectively ousts a court of jurisdiction over the action. In *State v. Third Judicial District Court,* 36 Utah 68, 104 P. 750 (1909), the Utah Court found that the removal of subject matter jurisdiction was sufficient to remove jurisdiction over the action.

> In this regard is there any distinction between ousting the court of jurisdiction of the subject matter and in ousting it of jurisdiction of the subject of the action? We think not. In either case, the statement is made that the test of jurisdiction is the power to act, and with this test the courts may not arbitrarily interfere.

*Id.* at 758 (on re-hearing). The dispute in the above case was in relation to the nature of the evidence which could be accepted in state courts to determine the court's jurisdiction. Similarly, in the instant case, the Legislature restricted jurisdiction as to the type of defendant against which evidence of nuisance may be proffered. The power that can restrict jurisdiction based on certain evidence submitted can also limit jurisdiction as to a particular cause of action to a properly defined constitutionally permissible class of defendants.

■ In addition, under Utah law, the actions of the Legislature are dispositive insofar as they relate to jurisdiction.

> The question with regard to conferring or withholding jurisdiction is always and everywhere legislative, and not judicial. Courts are created, and their jurisdiction and powers are determined either by the Constitution or by statute. A court cannot create its own powers; they must be conferred, either generally or specifically.

*Id.* This position has been reaffirmed in *State v. Johnson,* 100 Utah 316, 114 P.2d 1034 (1941). There the Utah Court interpreted Article VIII of the Utah Constitution to mean that jurisdiction of all courts inferior to the Supreme Court must be apportioned as the Legislature directed.

> There being no constitutional inhibitions, the legislature may define and prescribe the forum in which actions may or must be commenced, and the procedure necessary to pass from one court to another. Although there are certain constitutional limitations on the exercise of some powers by certain courts, the framers of the Constitution wisely refrain from conferring exclusive original jurisdiction upon any of them, vesting original jurisdiction in all courts inferior to the Supreme Court, to be apportioned and exercised as the legislature may direct. *Mill v. Brown,* 31 Utah 473, 88 P. 609, 120 Am. St.Rep. 935.

*Id.* at 1039. Therefore, it seems clear that under the Utah Constitution, the Utah Legislature may define the jurisdiction of lower courts as it sees fit. The court's role is only to interpret that intent and then apply it to cases pending and thereafter arising.[6] In

---

**6.** Plaintiffs have placed significant reliance on *Ireland v. Mackintosh,* 22 Utah 296, 61 P. 901 (1900). In so doing, they have misconstrued the case as standing for one which justifies a vesting of a potential cause of action notwithstanding subsequent repeal of that right by the Legislature. In *Ireland, supra,* the Utah Supreme Court found that "[i]n determining the question now under consideration, the object which the statute was passed to attain should be kept in view, and the construction which will most effectually accomplish the purpose of the statute should be adopted." *Id.* at 902. This is in accord with the standard followed by this court, *infra.*

Even without this manifestly obvious insistence by the Utah Supreme Court that legisla-

tive intent be paramount in determining the retroactive application of rights conferred or taken away by statute, *Ireland, supra,* can be distinguished on the ground that the right which the court determined was vested was an *absolute, defensive* weapon and not an *offensive* one. *Ireland v. Mackintosh, supra,* at 904; *see* headnote 3. Public policies affecting the right to assert defenses which arise solely by the passage of time are different than those affecting the right to claim continuance of a statutory right after its specific repeal. The very fact that the exercise of a statutory right requires both affirmative action in filing and judicial determination as to the correctness of the claim removes it from the "vesting" due to the passage of time as discussed by the Utah Supreme Court in *Ireland, supra.*

light of this court's earlier interpretation of the express and implied legislative intent in Section 78–38–5 as to this case, Utah precedent recognizes the power of the Utah Legislature to remove court jurisdiction over the case at bar by removing subject matter jurisdiction.

3. Does the action taken by the Utah Legislature in removing jurisdiction over the instant case violate the Utah Constitution or applicable statutory provisions?

Counsel for plaintiffs has argued that the requirements of Section 68–3–3, U.C.A. (1953) and the Utah Constitution, VI, Section 26, prevent the court from determining that Section 78–38–5 as to apply to the instant case. The court finds these two objections to be without merit.

a. Does Section 68–3–3, U.C.A. (1953) defeat the application of Section 78–38–5, U.C.A. (1953) to the instant case?

Section 68–3–3 states that "no part of these revised statutes is retroactive, unless expressly so declared." The court does not believe that this language bars application of Section 78–38–5 to the instant case for three reasons. First, the removal of jurisdiction of the courts over nuisance actions against three-year manufacturing operations is *not* retroactive. It is *present.* This court has not determined that under state law it *never* had jurisdiction over this case;[7] rather, it merely finds that *now,* after the passage of the act, prior to trial and entry of a final judgment, it does not have jurisdiction.[8]

For all of the foregoing, this court is not persuaded that plaintiffs' arguments claiming a "vested right" in the unamended Section 78–38–1, U.C.A. (1953) are recognized under Utah law. Nonetheless, this issue is mooted by the fact that even under the unamended Section 78–38–1, U.C.A. (1953), plaintiffs, as a matter of Utah and federal law, have failed to state a claim upon which relief can be granted.

7. Sitting as a court in diversity under 28 U.S.C. Section 1332, this court is required to apply Utah law. When this case was removed to this court from state court, the pleadings were based on Section 78–38–1, U.C.A. (1953). At

Second, the Utah Supreme Court has indicated that

[a] remedy may be provided for existing rights, a new remedy added to or *substituted for those which exist.* Every case must, to a considerable extent, depend on its own circumstances. *General words* in remedial statutes *may be applied to past transactions and pending cases,* according to all indications of legislative intent, and this *may be greatly influenced by considerations of convenience, reasonableness and justice.*

*Boucofski v. Jacobsen,* 36 Utah 165, 104 P. 117, 119–120 (1909) (emphasis added). While the rule announced in *Boucofski, supra,* was not specifically followed in *Industrial Commission v. Agee,* 56 Utah 63, 189 P. 414 (1920), a clarification of the apparent inconsistency was harmonized in *Petty v. Clark,* 113 Utah 205, 192 P.2d 589, 593 (1948). Under *Clark,* the Utah Court opined that *Agee* did not require the 1919 act to be applied to claims under the 1917 act because it was contrary to legislative intent and would have worked an injustice on the plaintiff. *Industrial Commission v. Agee, supra,* 189 P. at 416. Plaintiffs' claims do not follow (1) legislative intent as they did in *Agee* nor (2) constitute an injustice upon plaintiffs if the court dismisses them for lack of jurisdiction. All the evidence of legislative intent gives clear indication that the Legislature intended to completely prohibit and strongly discourage claims similar to those brought by the plaintiffs. There can be no injustice in applying the provisions of Section 78–38–5 to this case because this court also finds, *infra,* that the court does not have jurisdiction of

that time, prior to the 1981 amendments of Section 78–38–1, this court did have proper jurisdiction over the case. There is no dispute that diversity exists among the parties to this action.

8. The discussion of Utah law follows, *infra.* For federal precedent supporting such a position *see De Rodulfa v. United States,* 461 F.2d 1240, 1251 n. 56 (D.C.Cir.1972), *cert. denied* 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972); *Hospital Ass'n of New York State, Inc. v. Toia,* 577 F.2d 790 (2d Cir.1978).

plaintiffs' claims under Section 78–38–1, U.C.A. (1953) and federal law. In addition, plaintiffs' claims have no constitutional implications relative to a taking as did the claim in *Agee.* Therefore, under the *Boucofski-Agee* standard announced in *Petty v. Clark, supra,* plaintiffs cannot claim an improper application of Section 78–38–5 to the instant case.

Third, a similar rule of statutory construction requires that both the statute and legislative intent be liberally construed. Section 68–3–2, U.C.A. (1953) provides that

> [t]he rule of the common law that statutes in derogation thereof are to be strictly construed has no application to the statutes of this state. The statutes establish the laws of this state respecting the subjects to which they relate, and *their provisions and all proceedings under them are to be liberally construed with a view to effect the objects of the statutes and to promote justice. . . .*

(Emphasis added.) The Utah Supreme Court has noted that this section is to be applied when questions of first impression as to the construction of a statute are brought before it. *Houston Real Estate Inv. Co. v. Hechler,* 44 Utah 64, 138 P. 1159, 1160–1162 (1914). Therefore, in light of the clear intent of the Utah Legislature to *not only* address the problem of recurring nuisance suits against manufacturers in general, *but also* in particular the dilemmas faced by Hercules with expanding residential development in the vicinity of its plant, the court feels similarly compelled to give the provisions of the statute a liberal construction. There is evident in the Legislature's actions a significant interest and concern to encourage industry of the type defined and in question here, and to protect its economic

contribution to the community in terms of employment and tax base. Therefore, because of the express provisions of Section 78–38–5, Utah case law and Section 68–3–2, the court is persuaded that the provisions of Section 68–3–3 do not defeat the application of Section 78–38–5 to the case at bar.

 b. Does Article VI, Section 26 of the Utah Constitution prevent application of Section 78–38–5 to the instant case?

Plaintiffs claim that the apparent and significant involvement of Hercules in the passage of this bill violates the constitutional prohibition against a "private or special law [being] enacted where a general law can be applicable." This provision, approved at a general election on November 7, 1972, has been interpreted in four different cases by the Utah Supreme Court.[9] The most recent interpretation, *Hulbert v. State,* 607 P.2d 1217 (Utah 1980), is dispositive of plaintiffs' claim. Section 26 of Article VI of the Utah Constitution is not violated by the Legislature's removal of jurisdiction under state law in this case.

■ While Hercules was mentioned several times in the House debates as being a primary, moving force behind the passage of the bill,[10] there were numerous references as to the impact of Section 78–38–5 on (1) manufacturers as a general class in the state, (2) those manufacturers the state desired to attract to Utah and (3) on local governments with jurisdiction over manufacturing facilities.[11] Arguments of counsel that the involvement of Hercules made this bill "special" or "private" have been rejected in similar cases by the Utah Supreme Court.

---

**9.** *See Hulbert v. State,* 607 P.2d 1217 (Utah 1980); *McGuire v. University of Utah Medical Center,* 603 P.2d 786 (Utah 1979); *Utah Farm Bureau Ins. Co. v. Utah Ins. Guaranty Ass'n,* 564 P.2d 751 (Utah 1977); *Leetham v. McGinn,* 524 P.2d 323 (Utah 1974).

**10.** See footnote 4, *supra.*

**11.** In addition to Senator Barton's general comments in the Utah Senate, every speaker in the Utah House, except Representative Palmer, made specific reference to present manufacturers in Utah, those manufacturers the state wished to attract, or the role of local government in regulating manufacturers. A desire to encourage a climate conducive to increased manufacturing operations is a justifiable end that the Legislature may pursue. The nature of the bill and its relationship to the ends articulated during debate satisfy the rational basis test which should be applied in this situation.

[T]his Court has set forth the general definitions of general and special laws. In *Utah Farm Bureau Insurance Co. v. Utah Insurance Guarantee Ass'n,* [564 P.2d 751, 854 (1977)] this Court explained

"... A general law applies to and operates uniformly upon all members of any class, places, or things requiring legislation peculiar to themselves in matters covered by the laws in question. On the other hand, special legislation relates either to particular persons, places, or things or to persons, places or things which, though not particularized, are separated by any method of selection from the whole class to which the law might, but for the legislation, be applied.

"... [A] law is general when it applies equally to all persons embraced in a class founded upon some natural, intrinsic or constitutional distinction. It is special legislation if it confers particular privileges or imposes peculiar disabilities, or burdensome conditions on the exercise of a common right; upon a class of persons arbitrarily selected from the general body of those who stand in precisely the same relation to the subject of the law. The constitutional prohibition of special legislation does not preclude legislative classification, but only requires the classification to be reasonable."

*Id.* at 1223–1224 (emphasis added). Application of the Utah Supreme Court's standard that a general law is one where a reasonable classification applies equally to all persons in a class founded upon some natural, intrinsic, or constitutional distinction compels the conclusion that the law in question here is constitutional.

■ The law addresses the interests of manufacturers as a whole. It is to protect past property and future production interests. These operations, as defined in Section 78–38–6, are clearly based on a natural and intrinsic distinction. The bill provides that as to a specific group of manufacturers nuisance suits could not be brought. The selection of this group cut back the scope of

actions available under Section 78–38–1, the statute under which the instant case was brought. Those manufacturers who had been in existence for three years and were not increasing what was claimed to be a nuisance, or negligently operating their facility so as to cause or continue a nuisance, were protected by the bill. The Legislature passed this bill in an effort to address the concerns of present and future manufacturers who fear that urban or residential encroachment near their facilities will give rise to lawsuits such as this one. In addition to protecting the property rights of present manufacturers, the Legislature also sought to (1) preserve current jobs, (2) encourage new manufacturers to come into the state and (3) make the law on nuisance actions relative to manufacturing in harmony with those of agricultural operations. These goals are all reasonable. The means chosen to achieve these goals, e.g., removing jurisdiction of the courts and local governments as to these special manufacturing facilities, are clearly related to the attainment of the stated objectives of Section 78–38–5. Since plaintiffs have not alleged any deprivation of constitutional rights, there is no justification for applying a stricter standard of scrutiny to the bill than that previously announced by the Utah Court. Therefore, Section 78–38–5, *et seq.* U.C.A. (1953) is constitutional under Section 26, Article VI of the Utah Constitution.

4. Does Hercules come within the two exceptions under Section 78–38–5 which allow for jurisdiction of nuisance actions under Section 78–38–1 when the action arises from an expansion of the condition alleged to be a nuisance or the alleged nuisance is negligently caused?

Under Section 78–38–5, a manufacturer is included in its protection against nuisance lawsuits "provided, the manufacturing facility does not increase the condition asserted to be a *nuisance* and that the provisions of this subsection shall not apply whenever a *nuisance* results from negligent or improper operation of any such manufacturing facility." (Emphasis added.) The provisions, then, of Section 78–38–5 only remove the application of Section 78–38–1

when certain criteria do *not* occur. Plaintiffs have alleged that both an expansion of the nuisance and negligent operations have caused the nuisance complained of. The court finds that plaintiffs' claims must fail as a matter of law.

a. The plaintiffs' claim of the existence of a nuisance must fail as a matter of law.

▓ To qualify as a nuisance under Utah law, a claim must come within the provisions of Section 78–38–1, U.C.A. (1953) which provides that

[a]nything which is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance and the subject of an action. Such action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by nuisance; and by the judgment the nuisance may be enjoined or abated, and damages may also be recovered.

The Utah Court has interpreted this statute narrowly. It

has never interpreted the first word of the statute to mean "anything *at all* which (is) *any person considers to be* offensive to the senses," etc. Rather it has been held that the term "nuisance" is applied to "the *unreasonable, unwarrantable* or *unlawful* use by a person of his property," and that "every person has a right to the reasonable enjoyment of his property. As to what is reasonable use of one's property must necessarily depend upon the circumstances of each case, for a use for a particular purpose and in a particular way, in one locality, that would be lawful and reasonable might be unlawful and a nuisance in another. 1 Wood on Nuisances (3d Ed.) Sections 1 and 2. The test of whether the use of property constitutes a nuisance is *the reasonableness of the use complained of in the particular locality and in the manner and under the circumstances of the case.*" *Dahl v. Utah Oil Refining Co.,* 71 Utah 1, 262 P. 269,

273. (Emphasis added.) A stricter construction of the statute would make community living almost impossible. . . .

*Cannon v. Nueberger,* 1 Utah 2d 396, 268 P.2d 425, 426 (1954). (Emphasis is in original.) Later case law has indicated that a nuisance must be an *unreasonable* interference with *substantial* rights to come within the purview of Section 78–38–1.

It is recognized that every person has a right to use his own property as he sees fit so long as that use does not invade the rights of his neighbor *unreasonably and substantially.* Absolute quiet and repose is impossible and everyone must assume some burden of ordinary activities of others in the vicinity. The plaintiffs are only entitled to recover if the record supports the conclusion that *the conduct of defendant's business unreasonably and substantially interfered* with the quiet enjoyment of the plaintiffs' premises by themselves or of their tenants.

*Johnson v. Mount Ogden Enterprises, Inc.,* 23 Utah 2d 169, 460 P.2d 333, 336 (1969). (Emphasis added, footnote omitted.) In determining whether an invasion is both unreasonable and substantial,

the question is not whether a reasonable person in the plaintiff's or defendant's position would regard the invasion as unreasonable, but whether reasonable persons generally, looking at the whole situation impartially and objectively, would consider it unreasonable.

*Hatch v. W.S. Hatch Co.,* 3 Utah 2d 295, 283 P.2d 217, 220 (1955). The question then becomes two-fold: 1) Are the actions of the defendant unreasonable? 2) Is the injury complained of by the plaintiffs substantial? It is clear that the negative response which must follow each question removes the plaintiffs' complaint from the scope of Section 78–38–1.

(i) Are the actions of the defendant Hercules unreasonable?

Plaintiffs allege that Hercules, regardless of the standard of care used, is causing a nuisance because its operations require there be a high risk of explosion and possi-

ble future damage to adjoining property or property owners. These acts allegedly deprive the plaintiffs from full employment of their land and prevent its complete development as residential or industrial property. Even assuming arguendo that the plaintiffs have properly alleged that Hercules has negligently caused this nuisance, this court finds as a matter of law that plaintiffs' claim of nuisance cannot stand for three reasons. To hold Hercules' action is unreasonable would be to rule as a matter of law that the determinations of the Armed Forces Safety Board and the Zoning Commission are unreasonable. Furthermore, it would similarly require this court to create a new cause of action of nuisance not presently recognized by Utah law and ignore clear Utah precedent to the contrary.

■ As will be discussed in section IB(1) of this opinion, the operations at Hercules are governed by standards and requirements established by the DDESB. All buildings and manufacturing processes are required to come within safety standards designed to protect inhabitants and buildings within the vicinity of the manufacturing operations. The determinations made by this Board are discretionary, having been entrusted to the Board's high level of expertise. *McQueary v. Laird,* 449 F.2d 608, 610, 612 (10th Cir.1971). The standards have been incorporated into all of the contracts that Hercules has with the Department of Defense. (Mettenet affidavit, para. 6; MacPherson affidavit, para. 4.) The safety standards assume that there is an inhabited house on the edge of the Hercules property line and require safety specifications to be enforced so as to protect this imaginary house.[12] Hence, it cannot be held that such standards are unreasonable as a matter of law. The fact that Hercules has, in some instances, exceeded the requirements established by the Armed Forces Safety Board only gives greater support to this conclusion.[13]

■ Second, the Zoning Commission has made the operations at Hercules a subject of intense study and examination because of pressure from land developers seeking approval to expand residential housing closer to Hercules. The Zoning Commission has not found the operations to be so unsafe as to prevent the plaintiffs from building 150 homes on about twenty percent of their property. The determination by the Zoning Commission, when approved by county commissioners, is

> endowed with a presumption of validity; and it is the court's duty to resolve all doubts in favor thereof and not to interfere with the Commission's actions unless it clearly appears to be beyond its power; or is unconstitutional for some such reason. . . .

*Gayland v. Salt Lake County,* 11 Utah 2d 307, 358 P.2d 633, 636 (1961). The court assumes the County Commissioners gave ministerial approval to plaintiffs' request to build the first 150 homes. Section 57–5–3, U.C.A. (1953). A decision by this court that the operations of Hercules create such an unreasonable risk to land immediately adjoining these homes that Hercules' operations constitute a nuisance would, in effect, be a *prima facie* determination that the earlier approval was unreasonable. Such a holding under Utah law would be contrary to the presumptive validity accorded determinations by the Zoning Commission as approved by the County Commissioners. Without significant, specific allegations and evidence to the contrary, the reasonableness of the Commission's actions must stand.

■ Third, in light of the legislative intent, it would be unreasonable to create a new cause of action under nuisance which could be applied as to *any* manufacturing operation in the state. In reviewing a claim by a church congregation that a nuisance was created by the noise from a train running by their building during their meeting hours, the Utah Supreme Court denied the request and ruled that the effect of such a ruling on other enterprises in the

---

**12.** *See* Mettenet Deposition at 177.

**13.** *Id.* at 218–220, 263–264.

state would be an important factor in determining the reasonableness of the complaint.

If, therefore, it should be held that noises arising out of the present industrial pursuits and business activities shall give a right of action, all enterprises from which annoyances arise must be held liable in action for damages. There is, there can be, no middle ground; *and under our theories of government, grounded upon the fundamental principle of equality before the law, all must either suffer some annoyance, or all who cause them must be held liable for damages. The law seeks for practical as well as just results whenever such are obtainable.* The practical way, therefore, out of such a difficulty is that interferences and annoyances which are common to all—that is, where all suffer from the same kind of interference and annoyance, and the difference of annoyances as between communities or individuals is one of degree merely, and not of kind, and the annoyance is caused by something which is a necessary part of some lawful enterprise which is in its nature public and cannot be shifted from place to place—all must bear the annoyance as best they may.

*Twenty-Second Corp. v. Oregon Short Line R. Co.,* 36 Utah 238, 103 P. 243, 249–250 (1909, emphasis added). The practical ramifications of holding such to be a nuisance was obvious to the Utah Court.

If mere annoyances from noises which are necessarily incident to the conduct of a lawful business in its nature public can be made the subject of damage suits, then we can see no point at which a line may be drawn when such actions may and may not be maintained. If mere annoyances from noises give a right of action for damages, then every one who is annoyed must be permitted to sue for and recover damages to the extent to which he is affected. The questions, therefore, in each case, would depend upon the intensity of the noises and the extent of the annoyance. *Every one who may live within the radius to which the noises may extend would have a right of action, and the amount of recovery would be gradu-*

*ated from the source of the noise, unless the noise was diminished by some artificial means.*

*Id.* at 249 (emphasis added). The Court found basic practicality—both in terms of the impact on like plaintiffs and in terms of judicial administration—required that the claimed nuisance be borne "as best they [the plaintiffs] may." *Id.* at 250.

The same rationale applies in this case. Were the court to find that the risk of possible explosion attendant manufacturing operations—absent any actual explosion—were to state a claim for nuisance, it would, of necessity, have to find the potential for similar claims as to all others who were within a possible radius of damage from an explosion at *Hercules or any other manufacturing plant in the state.* Such a result would not comport with the mandate from the Utah Court to "seek practical as well as just results whenever such are obtainable." *Id.* at 250. Such a law would not be practical from a judicial administration point of view, nor from the clear public policy articulated in Section 78–38–5, *et seq.* U.C.A. (1981), favoring the rights of established manufacturers. Therefore, because of the determinations by the DDESB, extra compliance by Hercules with federal safety standards, approval by the Zoning Commission and County Commission of plaintiffs' construction of 150 homes adjoining the disputed property and the clear public policy enunciated by the Legislature in Section 78–38–5, this court rules as a matter of law that under the facts and pleadings of this case the claimed nuisance caused by the actions of Hercules are not unreasonable and therefore do not constitute a nuisance under Section 78–38–1.

(ii) Even if the actions of Hercules were unreasonable, can the plaintiffs be substantially injured?

 Plaintiffs claim they have been damaged because the value of plaintiffs' property being held for investment purposes has been greatly impaired, significantly damaging plaintiffs' opportunity to resell the property for residential and in-

dustrial purposes. (Amended Complaint, para. 26.) The loss of speculative profits on land development has not been recognized as a legal injury in Utah. While the claim has not arisen in a nuisance action, it has been clearly treated in two different actions seeking to overturn zoning classifications. In *Dowse v. Salt Lake City Corp.*, 123 Utah 107, 255 P.2d 723 (1953), the Court found that

> [t]he fact that plaintiff's one-half lot might be more profitably used for commercial than residential purposes does not show discrimination or reveal arbitrary action. The character of the district as a whole must be kept in mind in determining whether the health, safety, morals or general welfare of the district and hence of the community would be promoted by permitting encroachment into the residential area of commercial or industrial establishments. [Citations omitted.]

*Id.* at 724. The plaintiff claimed, *inter alia,* that confiscation had occurred. The Court found that there was no cause of action stated. It can be inferred, then, that there was no *substantial* injury subject to confiscation. The facts of this case and the claim of loss of more profitable use fall within the precedent of *Dowse.*

The additional claim of injury because of continued recognition by zoning authorities of the viability of ongoing businesses similarly has not been recognized as stating a substantial claim of confiscation. In *Chevron Oil Company v. Beaver County,* 22 Utah 2d 143, 449 P.2d 989 (1969) the Utah Court found that

> [p]laintiffs are not deprived of their property. They bought grazing land, and they still own grazing land. It may well be that should their holdings be zoned for highway services they would prosper, and it also may well be that other established highway services would be put out of business.

*Id.* at 991. The Utah Supreme Court clearly recognized that a preference for existing business is sufficient to deny a claim of confiscation when the only effect of damage to "new" businesses is a loss of speculative profits. Even though confiscation is a doctrine applicable in zoning challenges and claims of eminent domain, such holdings offer clear precedent indicating that the Utah Supreme Court would not recognize plaintiffs' particular claims as being substantial.

An examination of the facts evidenced in plaintiffs' depositions also indicates that they have received sufficient profits solely from the sale of nearly 36 acres of land for development purposes to pay for the additional 57 acres of undeveloped land that is the subject of this lawsuit.[14] The fact that more profits are not immediately available does not give rise to any claim of substantial economic injury. The plaintiffs knowingly took a calculated risk when they bought agricultural land adjoining a manufacturing operation and sought to develop it as residential property.[15] The loss of specu-

---

14. The breakdown of internal profits from the sale of 35.32 acres of land used in plaintiffs' initial residential subdivision is as follows:

Total amount derived from the sale of 35.32 acres [Christensen deposition at 156–157, Exh. 24, 27 and 28.] $640,518.98

Total cost of the 93 acres zoned residential. [*Id.* at Exhibit 14] 465,000.00

Net profit on the sale of 35.32 acres *in addition* to initial cost of remaining 57 undeveloped acres $175,518.98

Additional profits derived from the development and sale of some of the homes on the 35.32 acres were at least $200,000. (*Id.* at 34, 157).

15. Dr. Huntsman admitted that "[t]here is always a risk in buying property zoned agricultural mode until it's rezoned." Huntsman deposition at 20–21. Plaintiffs recognized that they might not be able to secure the zoning they desired and reserved the right to revoke their offer to purchase the land in question—with full refund of their earnest money—if they could not obtain satisfactory zoning. *See* Exhibit 8 at 3, Exhibit 9 at 2, of Christensen deposition. Richard T. Pratt explained at his deposition the reasons why the plaintiffs acted in that manner.

> Question: Inviting your attention, Mr. Pratt, to Exhibit A on the second page of that Exhibit, paragraph one entitled utilities and zoning, do you recall why that particular provision was contained in the agreement?

lative profits because the assumed risk was more potent than anticipated does not justify a claim that the speculative loss was *caused* by the operations of Hercules.[16] Therefore, plaintiffs have failed to state a claim of nuisance under Section 78–38–1. Having failed to state a nuisance, as a matter of Utah law, *supra,* plaintiffs do not come within the exceptions stated in Section 78–38–5.

> b. Even if plaintiffs had stated a cognizable claim of nuisance under Section 78–38–1, they fail to state a claim of nuisance arising from a claimed increase in the condition asserted to be a nuisance *or* the operator's negligence.

Having failed to state a claim under Section 78–38–1, there is no "nuisance" which could be caused by negligence or expanded operations and thereby be removed from the protection offered resident manufacturers under Section 78–38–5. However, because counsel have fully addressed the application of these exceptions to the instant case, the court will assume, *arguendo,* that a cause of negligence has been pled under Section 78–38–1 and rule on the arguments.

> (i) Hercules has not expanded its operations in accord with legislative intent so as to come outside Section 78–38–5.

The Utah Legislature intended that a manufacturer accused of maintaining a nuisance would have to (1) expand his facilities on land not owned by him when he began operations *or* (2) expand the facilities on existing land to a *great* extent.

▇▇ The Utah House clearly intended the expansion requirement to be construed *against* the person alleging the nuisance rather than the manufacturer. During debate, the following colloquy took place between Representative Harmer, sponsor of Section 78–38–5 in the House, and Representative Christensen.

REPRESENTATIVE CHRISTENSEN: Has the bill got enough for enlargement of facility? Hopefully when they come to our area they are going to grow and develop and expand, and it just says "Does not increase the condition of the nuisance." Is that enough to make them have the protection they need?

REPRESENTATIVE HARMER: Yes, I believe so. Most of their protection comes from their future planning when they buy land that they can expand properly in the future. But I do believe it does cover it.

REPRESENTATIVE CHRISTENSEN: They are comfortable with it then?

REPRESENTATIVE HARMER: Yes, sir.

(HP at 7–8.) The court believes Representative Christensen's asking as to how "they" felt regarding the bill had reference to manufacturers in the state, including Hercules, who were obviously interested in the outcome of the debate. The allegations of the plaintiffs that the nuisance complained of will increase due to "work about to com-

---

Answer: Well, it was our feeling that if utilities could not be made available to the property, that we would certainly want to reassess the desirability of purchasing the property. We would not want to be held to a purchase contract in that event.
Question: And did the same general philosophy apply to zoning?
Answer: Yes. We would at least have wished to have the right to reconsider our options.

Pratt deposition at 32. The "escape" clauses as to additional purchases under their option if acceptable zoning were not satisfied were not exercised. *See* Exhibits 12, 26, 31 and 34, Christensen deposition.

**16.** The very presence of Hercules was what allowed the plaintiffs to purchase property at such a low price as the agricultural zoning of the property was in accord with the County Master plan for development. *See* Huntsman deposition at 20 and the certified copy of Official Minutes of the Salt Lake County Planning & Zoning Commission Meeting of September 24, 1974, re. # 2123 as contained in Appendix II, Defendant's Memorandum in Support of Second Motion for Summary Judgment, July 17, 1981. Plaintiffs are claiming that the continued existence of Hercules is preventing them from gaining additional speculative profits when the very existence of Hercules was what provided them with a low base price for the land.

mence involving substantially larger rocket motors," does not come within the intent expressed by the Utah House. It is clear that the House intended the expansion to focus on the acquisition of more property upon which the same manufacturing facility expanded. There is no allegation that Hercules has acquired or is attempting to acquire more property on which to expand; in fact, plaintiffs appear to desire Hercules to purchase portions of *their* land so as to serve as a buffer zone around the plant and thereby protect surrounding residents who may purchase potentially new homes placed on the remainder of plaintiffs' property. The only use of additional property by Hercules since beginning missile contracts in 1960 has been the use of Dugway Proving Grounds for the testing of certain rocket motors. This new testing site is located in adjoining Tooele County. Therefore, under the intent of the Utah House, the actions of Hercules alleged by the plaintiffs do not constitute an expansion of the alleged activity causing a nuisance.

The standard announced in the Senate called for the exception to mean "expand[ing] their operations [or] chang[ing] their operations in any *great* extent." [Transcript of Senate Proceedings at 1 (emphasis added)]. The alleged activities of Hercules do not fall within this standard. First, there is no expansion of facilities onto adjoining property as noted in the discussion relative to the intent of the House. Second, increasing the size of one's rocket motors which are being produced on a 3,000 acre manufacturing facility, where testing of said rockets is occurring at a remote location from the plant and plaintiffs' property, does not constitute "chang[ing] ... operations in any great extent." *Id.* Therefore, Hercules has not acted in such a manner as to bring itself within an exception of Section 78–38–5 as intended by the Utah Legislature.

 In addition to general allegations of expansion in plaintiffs' complaint,

counsel for plaintiffs indicated to the court that "[w]hile discovery in this case is far from complete, completed discovery demonstrates overwhelmingly that the nature of Hercules' operation (a) has changed substantially since 1970, and (b) is going to change even more substantially in the near future as a result of work about to commence involving substantially larger rocket motors.[17] This claim of future expansion does not come within the exception of Section 78–38–5 for two reasons. First, the evidence of a substantial change in rocket motor assembly in 1970 is not relevant to this case. Plaintiffs did not purchase their property until 1977. Therefore, any evidence that *substantial* changes occurred in manufacturing operations in 1970 only undercuts the claim that present or future changes will change operations in "any *great* extent." (Transcript of Senate Proceedings at 1.) Second, under Utah law injunctive relief against the future possibility of nuisance arises only when "there is a reasonable apprehension that the nuisance will be created or will be renewed." *Brough v. Ute Stampede Ass'n,* 105 Utah 446, 142 P.2d 670, 673 (1943). There is no evidence asserted that would support a "reasonable apprehension" that a nuisance will be created by the future operations of Hercules based on present circumstances. Inasmuch as the court finds that there has been no nuisance, there is no possibility that an earlier nuisance could be renewed as it was in *Brough, supra.* Therefore, the allegation of future expansion at the Hercules plant does not remove this case from the protection of Section 78–38–5.

(ii) Plaintiffs have not stated a claim of nuisance arising from the negligence or improper conduct of Hercules.

 Plaintiffs allege several times in their complaint that Hercules negligently and recklessly maintained a public and private nuisance for which they claim $8,000,000 in damages. However, under the facts

17. Letter from Richard W. Giauque, counsel for plaintiffs, to Judge Aldon J. Anderson, December 17, 1981, at 2.

presented in this case, and relevant Utah law, plaintiffs have not pled a claim of negligence. The court will assume, *arguendo,* that a nuisance under Section 78–38–1 in fact exists.

"Plaintiffs' naked assertions of negligence, unsupported by any facts whatsoever that defendant failed to maintain its [manufacturing operations] 'correctly' or 'adequately,' falls far short of raising a material issue of fact on the issue of negligence." *Massey v. Utah Power and Light Co.,* 609 P.2d 937, 938–939 (Utah 1980). *See also Transamerica Title Ins. Co. v. United Resources, Inc.,* 24 Utah 2d 346, 471 P.2d 165, 168 (1970). The court has carefully reviewed all of the memoranda, arguments, depositions and accompanying exhibits and is unable to find specific facts which would support the plaintiffs' claim of negligence or reckless conduct. Therefore, the general pleading of negligence, absent specific facts to support such a pleading, is insufficient to raise a material fact in opposition to a motion for summary judgment.

Having failed to state a claim under negligence or expansion of operations causing a nuisance, plaintiffs have failed to bring the facts of the instant case within the exceptions provided for in Section 78–38–5 which allows actions in nuisance to be brought against a manufacturer protected by Section 78–38–5. Future undocumented claims of expansion are not significant because they have not created a factual base from which a reasonable apprehension could develop that a nuisance would be created by future operations of Hercules. There being no evidence of nuisance shown or alleged under the facts and law applicable, there is no nuisance that could be either negligently caused or expanded through increased operations. As such, under Utah law, plaintiffs' claims for public and private nuisance are barred by application of Section 78–38–5.

B. As a matter of federal law, application of the sovereign immunity of the United States bars any court from assuming jurisdiction over plaintiffs' claim of public and private nuisance.

The defendant's first motion for summary judgment was argued on the basis of derivative sovereign immunity. In defendant's response to plaintiffs' amended complaint, three defenses are raised which appear to be intertwined with the concept of sovereign immunity.

All of the activities of defendant which are the subject of allegations by plaintiffs are directed, supervised and controlled by the United States of America in furtherance of its military defense and this action is barred by virtue of the sovereign immunity of the United States.

Plaintiffs have failed to name necessary and indispensible [sic] parties.

All allegations contained in the Amended Complaint concern activities conducted at defendant's plant which are controlled by the United States of America. The proper remedy for any alleged nuisance is pursuant to the Federal Tort Claims Act, 28 U.S.C. Section 2401, thus requiring dismissal of this action.

Answer to Amended Complaint, Affirmative Defenses 6, 7 and 8, August 14, 1981. The court interprets the claim in paragraph 6 to constitute a mixed statement claiming derivative and absolute sovereign immunity. Before the court can determine the validity of defendant's claims of sovereign immunity raised by motion or those raised by way of answer, it must resolve whether state or federal law governs such a determination.

1. Federal law is the dispositive law which is to be applied to determine the rights of parties in cases where defenses relating to the sovereign immunity of the United States are asserted.

The issue as to which law governs the application of sovereign immunity when it is asserted by a Department of Defense (DoD) contractor was perceptively raised—but unanswered—by Judge Williams in *Schrader v. Hercules, Inc.,* 489 F.Supp. 159 (W.D.Va.1980).

While the question of whether the defense of sovereign immunity is available

would seemingly require reference to federal law when the immunity invoked is that of the United States, the question has not been raised, and is not here decided.

*Id.* at 161 n. 3. Both *Schrader, supra,* and *Green v. ICI America, Inc.,* 362 F.Supp. 1263 (E.D.Tenn.1973), two of the main cases supporting defendant's motion for summary judgment, were decisions construing state law. While *Schrader* reserved the question, *ICI, supra,* found that "[a]n examination of the record in light of the controlling *Tennessee* law leaves no doubt that the defendant is entitled to share in the sovereign immunity of the United States." *Id.* at 1266. Furthermore, nearly all of the numerous precedents cited by plaintiffs in opposition to defendant's claim of derivative sovereign immunity are based on state law as articulated by state courts. Nonetheless, the court finds the facts of this case compel the conclusion that federal law must be applied to determine the validity of defendant's claim of sovereign immunity.

The nuisance claims of the plaintiffs seeking declaratory and monetary relief are based on the existence of a risk of explosion attending the Hercules-NIROP manufacturing facilities which creates an "over blast pressure area." This risk is allegedly "intentionally maintain[ed]," (Amended Complaint, para. 48, fourth cause of action) and occurs "whether or not the defendant exercises reasonable care in conducting its operations," (*id.,* para. 19, first cause of action), or is "unreasonable, improper, negligent and reckless [in its conduct]." *Id.,* paras. 30, 57, second and fifth causes of action. Allegedly this risk of explosion creates a fear which influences prospective buyers or developers and thereby prevents property adjoining Hercules from being sold and developed in a manner that will maximize plaintiffs' profits. This same type of injury appears to follow the claim of both public and private nuisance.

Because of the manifestly obvious risk of explosion that attends in some degree any manufacturing of missiles or munitions, Hercules and all other explosives contrac-tors are required to follow minimum safety standards as they relate to the siting of manufacturing facilities as promulgated by the Department of Defense Explosive Safety Board (DDESB), 32 C.F.R. Section 186.1, *et. seq.,* promulgated under 10 U.S.C. Section 172. The safety standards established under the authority of this joint-service board is to be considered binding as a minimum safety standard. 41 Op.Atty.Gen. October 27, 1949. The DDESB is to advise the Secretary of Defense and other high-level civilian administrators in the DoD as to the proper siting of facilities used in the manufacturing, testing, handling and storing of explosives in an effort to "prevent conditions that will endanger life and property, both inside and outside DoD installations." 32 C.F.R. Section 186.4(a). The Board also has been given the assignment to use its professional expertise to "[s]urvey, study and evaluate activities to determine compliance with ammunition and explosives safety standards and to detect conditions which *could result in undue loss of life or damage to property inside and outside DoD installations.*" 32 C.F.R. Section 186.4(f) (emphasis added).

It is undisputed that Hercules has complied with the *minimum* safety standards required by the DDESB. Department of Defense contracts contain the safety standards and operational requirements set by the United States. Hercules cannot manufacture or even be awarded a contract by DoD unless the DoD has certified that Hercules manufacturing facilities (and implicitly those used in the manufacturing process) on the adjoining 520 acres of the NIROP meet the standards set by the government.

A. Before you can get a contract, the government has got to approve that contract. And the government says to you, if you have this contract, you have to have all the safety that is required by the government incorporated into the contract. You just can't deviate from DOD or U.S. Army or materials handling for the contract that you shall get.

They want to know that you certainly conform to all the safety regulations that's required before they will even

award you the contract. So therefore when you say what does—The only thing the safety department would make sure is that we didn't leave anything out, which is going to be reviewed by them [DoD and their safety crews] anyway. So we have very little control when you talk about government contracts. They spell it out for you. In fact, I think one of those contracts, you can't carry; it's high as this room here in paperwork.

Q. So that would be the extent of the safety department's involvement [in pre-award safety inspection]?

A. Right.

Deposition of Gilbert E. Cain, April 7, 1981, at 74–75 (hereinafter Cain Deposition). The standards the DDESB promulgate indicate that Hercules must comply not only with safety requirements of a particular contract, but also with those governing the siting of all facilities at the Hercules-NI-ROP manufacturing plant and at the static testing site located some 80 miles away.

Ernest A. Mettenet, Jr., General Manager at Hercules, indicated that

[o]ur facilities siting has to be approved by the Armed Forces Safety Board [DDESB] before we do a thing, and one of the primary purposes of the Safety Board's review is to assure that the inter-line distances, quantity distances and inhabited building distances are met.

Deposition of Ernest A. Mettenet, Jr., July 15, 1981, at 135 (hereinafter referred to as Mettenet Deposition). James F. Cross, Safety Manager at Hercules from 1971–1978, indicated that the DDESB had to approve the design specifications of a testing facility built some 80 miles away from the existing manufacturing operations on the initiative of Hercules in an apparent effort to assure greater safety after an explosion of a rocket engine tested in 1974.

Q. While you were at Bacchus, was the location of any operation changed for safety reasons?

A. Yes, sir.

Q. What was changed?

A. A static test facility was built out in I believe it's called Skull Valley.

\* \* \* \* \* \*

Q. Where's Skull Valley?

A. Roughly 80 miles west of Magna [where Hercules is presently located].

\* \* \* \* \* \*

Q. In any event, Mr. Cross, did you have *any conversations . . . concerning* building this static test facility in Skull Valley?

\* \* . \* \* \* \*

A. A lot of conversations was held about the layout of the facility at Skull Valley, the size of the bays, the approaches of the firing bays, quantities of explosives and rocket motor size that we ought to account for; a discussion of the technical details, if you will, of how to lay out the facility, where the control house should be, things of that nature.

Q. Did you take any notes of these conversations?

\* \* \* \* \* \*

A. Not per se that reflected the conversations. The end result would have been the design criteria of the drawings which describe that facility.

Q. *Did you have any conversations or communications with any government official or representative relating to the design criteria of the drawings?*

A. To the best of my recollection, *these drawings were submitted to the Department of Defense Explosive Safety Board for their concurrence in the design and spacing of the facility.*

Q. You said Department of Defense Explosive Safety Board?

A. Yes, sir.

Q. In connection with the building of the strategic [static] test facility in Skull Valley, was anything else submitted to any agency of the government?

A. Not that I'm aware of.

Deposition of James F. Cross, April 6, 1981, at 120–123 (emphasis added). The strict adherence by local executive and safety management to the building specifications

promulgated by the DDESB is in accord with national policy described by Gilbert E. Cain, National Safety Director for Hercules, Inc.

Q. Now, have any concerns to which you have referred [dealing with the safety of residences and businesses surrounding the plant] been reduced to writing?

A. The DOD manual, Department of Defense manual, reduces it to writing. If you are dealing with the U.S. Army, they have their laws which we must comply to. We have the Navy; and if you read them, you will see that they take into account how far you shall be from a road, from this, from that. And we are right down the line. We are right down the line with them.

Q. At your staff meetings, have you ever discussed your company's concerns for the safety of the residences and businesses surrounding your plants?

A. Not formally. They would come into discussion as we prepare something, to see that we do conform with the regulation that's there. I mean, we wouldn't try to bypass it or underrate it, because it would be ridiculous to do that. Why spend all this time, money and effort and then have the government come along and say you can't do it? So we're conforming as to what the regulations state. If DOD tells me that I have to be 1500 yards away because I have this type here, it's going to be 1500 yards or maybe even more. But you cannot reduce it. You can make it better if you wish, but you cannot do that. It's all specifically laid out.

Q. Does your company have any concerns for that safety other than compliance with regulations?

A. If we conform, then we believe that we have taken care of it. I don't really understand what you're trying to say. *Do we have concern? We have concern but it's already been answered by the regulations which does protect. So we believe that if they do protect and we conform, we have taken care of the concern that we have for roads, residences, railroads, whatever ... you're talking about. It's all really spelled right out there.*

Cain Deposition at 58–60 (emphasis added). The apparent belief that the Hercules management has that the DDESB siting regulations are sufficient to protect habitations *outside* their operations appears to be based on the fact that the "inhabited building" which is used as the reference point for facilities within the Hercules-NIROP complex is an imaginary, inhabited building within the facility.

[Mettenet] Maybe I misled you a little bit, Mr. Casey [counsel for plaintiffs]. When I speak of inhabited building, that inhabited building is contained within our property line...

When we talk about inhabited buildings, if we're within inhabited building distance within our property line, it's automatic that we would be within inhabited building distance outside our property line, because no inhabited building would go beyond our property line, if you follow what I'm saying.

Mettenet Deposition at 177.

Plaintiffs do not contend that Hercules has not complied with the *minimum* safety standards set forth by the DDESB. Nothing has been introduced to indicate that the siting of all facilities at Hercules, Bacchus Works, or its testing facilities are not in compliance with the minimum DDESB standards. In fact, in a memorandum submitted by plaintiffs in reply to defendant's first motion for summary judgment plaintiffs indicate that "Hercules' determination of how much explosive is to be located or stored in a particular building is based upon the quantity distance standards set forth by the government." "Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment, Filed November 14, 1980," August 14, 1981, at 20 (hereinafter referred to Memorandum of August 14, 1981).

In light of these undisputed facts it is clear that the precedent articulated in *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), *Clearfield Trust Co. v.*

*United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) and *United States v. Standard Oil Co.,* 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1946) all require that federal law be used ultimately to determine the viability of a defendant's claim. So here, plaintiffs' request for declaratory and monetary relief should be dismissed by reason of defendant's derivative assumption of the sovereign immunity of the United States. Furthermore, the same precedent compels the conclusion that plaintiffs' claims of nuisance *as pled in this case* must also be governed by federal law.

a. Plaintiffs' claim of nuisance must be ultimately governed by federal law.

■ Plaintiffs have alleged that the manufacturing operations at Hercules are creating a risk of explosion that constitutes a nuisance to adjoining land owners. Nuisance actions are traditionally questions of state law. However, the foundation of plaintiffs' amended nuisance claim is one which is already resolved by procedures firmly rooted in the Constitution, specific Congressional statute, resulting regulations and federal case law. The seminal case of *Erie v. Tompkins, supra,* specifically held that *"[e]xcept in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State."* 304 U.S. at 78, 58 S.Ct. at 822 (emphasis added).

As noted earlier, the DDESB has been given the express assignment to use its expertise to "[s]urvey, study, and evaluate activities to determine compliance with ammunition and explosives safety standards and to detect conditions which *could result in undue loss of life or damage to property inside and outside DoD installations.*" 32 C.F.R. Section 186.4(f) (emphasis added). The DDESB was formulated under the provisions of the Military Storage Act, 10 U.S.C. Section 172. The Tenth Circuit found the power to promulgate rules determining safety standards to be used in the handling, storage and transportation of dangerous materials used by the Department of Defense "clearly constitutes a dis- cretionary grant of the sovereign power" and was "anchored firmly to Art. I, Sec. 8, Clause 17 of the United States Constitution." *McQueary v. Laird, supra,* at 610, 612. Therefore, as a matter of federal law, the siting requirements established at the Hercules-NIROP facility are those reflecting a *policy determination by a federal board given discretionary authority* that compliance with the federal requirements was sufficient to eliminate a risk that *"could result in undue loss of life or damage to property inside and outside DoD [or their contractors] installations."* 32 C.F.R. Section 186.4(f). Inasmuch as a review by this court of the very questions leading to a determination of what constituted an "undue loss" begs the policy questions and decisions inherent in the balancing tests required under Utah law to evaluate nuisance actions, it is clear that plaintiffs' claim of injury arising from the risk of explosion at the Hercules-NIROP facility, designed and built in accordance with safety standards promulgated by the DDESB to eliminate any "undue risk," must be governed by federal law.

Such a conclusion is in accord with the synthesis of the principles of the *Clearfield* decision articulated by the Supreme Court in *United States v. Standard Oil, supra,* and the Tenth Circuit's analysis in *McQueary v. Laird, supra.*

We agree with the Government's view that the creation or negation of such liability is not a matter to be determined by state law. The case in this aspect is governed by the rule of *Clearfield Trust Co. v. United States,* 318 U.S. 363 [63 S.Ct. 573, 87 L.Ed. 838], and *National Metropolitan Bank v. United States,* 323 U.S. 454 [65 S.Ct. 354, 89 L.Ed. 383], rather than that of *Erie R. Co. v. Tompkins, supra.* In the *Clearfield* case involving liabilities arising out of a forged endorsement of a check issued by the United States, the Court said: "The authority to issue the check had its origin in the Constitution [in this case Art. I, Sec. 8, Clause 17] and the statutes of the United States [in this case 10 U.S.C. Section 172] and was in no way dependent on the laws

of [Utah] or any other state. [Citations omitted.] The duties imposed upon the United States and the rights acquired by [its contractors] as a result of the issuance [or manufacture] find their roots in the same federal sources. [Citations omitted.] In the absence of an applicable Act of Congress it is for federal courts to fashion the governing rule of law according to their own standards." 318 U.S. at 366–367, 63 S.Ct. at 574–575.

*United States v. Standard Oil, supra,* 332 U.S. at 305, 67 S.Ct. at 1606–1607.

 b. Defendant's claim of derivative sovereign immunity must also be governed by federal law.

■ Defendant's claim of derivative sovereign immunity must be determined solely on the basis of federal law because it is the immunity *of the United States* which is being extended or restricted. In light of the extensive defense related manufacturing operations at the present time, the doctrine of derivative sovereign immunity, under proper conditions, could be invoked, and therefore construed, in courts within all fifty states and other federal areas. Mindful of these possibilities,

> [this likely] application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain.

*Clearfield Trust Co. v. United States, supra,* 318 U.S. at 367, 63 S.Ct. at 575. The manifestly conflicting conclusions under state law as to the availability of derivative sovereign immunity when dealing with ultrahazardous operations,[18] as do many defense related contractors, requires such a conclusion. The similar question of negligence, which can remove a defense contractor from the shelter of derivative sovereign im-

munity, requires the application of federal law for the same reasons.

 2. Having found federal law to apply, what is a proper source of federal law?

■ The application of "federal law" in the *Clearfield* case was derived from the earlier body of "federal common law" governing commercial relationships which had been decided during the "regime" of *Swift v. Tyson,* 16 Pet. (41 U.S.) 1, 10 L.Ed. 865 (1842) (quoted in *Clearfield, supra,* 318 U.S. at 367, 63 S.Ct. at 575). The extent and reach of that "federal law" was explained by the Supreme Court in *Standard Oil Co., supra.*

> [A]lthough federal judicial power to deal with common-law problems was cut down in the realm of liability or its absence governable by state law, that power remained unimpaired for dealing independently, wherever necessary or appropriate with essentially federal matters, even though Congress has not acted affirmatively about the specific question.
>
> In this sense therefore there remains what may be termed for want of a better label, an area of "federal common law" or perhaps more accurately "law of independent federal judicial decision," outside the constitutional realm, untouched by the *Erie* decision....
>
> [Nonetheless,] [i]t is true, of course, that in many situations, and apart from any supposed influence of the *Erie* decision, rights, interests and legal relations of the United States are determined by application of state law, where Congress has not acted specifically. "In our choice of the applicable federal rule we have occasionally selected state law." *Clearfield Trust Co. v. United States,* 318 U.S. at 367, 63 S.Ct. at 575.

*United States v. Standard Oil Co., supra,* 332 U.S. at 307–308, 67 S.Ct. at 1608. Having already examined in detail Utah law as it applies to plaintiffs' claim of nuisance, *supra,* this court chooses not to apply Utah

---

**18.** *See* "Right of Contractor with Federal, State or Local Body to Latter's Immunity From Tort Liability," 9 A.L.R.3d 382, 403–409, Sec. 9.

law as federal law in this case. The non-exclusive source of federal law which the court will use in this case will be the relevant decisions of federal courts construing federal questions before them as well as federal statutes and the administrative interpretations thereof. A federal court sitting in diversity, is interpreting and promulgating state law and not "federal law" which this court must use in resolving federal issues before it.

 3. Can plaintiffs' requests for monetary and declaratory relief by reason of defendant's alleged nuisance stand against defendant's assertion of derivative sovereign immunity under federal law?

 a. Plaintiffs' claim of nuisance does not stand as a matter of federal law.

■ While the plaintiffs' diversity claim of nuisance is based on Utah law, this court finds that federal law requires these claims to be dismissed. There is no question of fact that the siting requirements promulgated by the DDESB have been followed by Hercules and thus eliminated, in practical terms, "conditions which could result in undue loss of life of damage to property inside and outside DoD installations." 32 C.F.R. Section 186.4(f). Therefore, there can be no nuisance arising solely from the existence of harm arising from a possible future explosion or accident at the Hercules-NIROP operations. While the court notes that current *Utah* law reaches the same result, it believes that the federal law articulated above must ultimately govern as manufacturing operations critical to national defense cannot and must not be significantly hampered by state or local law that would block or limit national development in favor of more private gain or benefit.

 b. Defendant's claim of derivative sovereign immunity must stand as a matter of federal law.

Defendant Hercules appears to have based its claims of derivative sovereign immunity on the grounds that it has not exceeded its authority under its contracts as a first and second tier contractor with the government and that said contracts were validly conferred upon Hercules. *Yearsley v. W.A. Ross Const. Co.,* 309 U.S. 18, 20–21, 60 S.Ct. 413, 414–415, 84 L.Ed. 554 (1940). Plaintiffs contend, *inter alia,* there are at least five reasons why this doctrine does not apply to Hercules in the instant case. First, Hercules is a second-tier contractor, or one who works with the government because of Hercules' contract with Lockheed. Second, Hercules is not controlled or supervised by the federal government as required by *Logue v. United States,* 412 U.S. 521, 529–530, 93 S.Ct. 2215, 2220–2221, 37 L.Ed.2d 121 (1973). *Cf. Eustler v. United States,* 376 F.2d 634 (10th Cir.1967); *United States v. Page,* 350 F.2d 28 (10th Cir.1965). Plaintiffs have introduced sufficient evidence which places at issue the degree of daily government control that is exercised by the government over the Hercules portion of the Hercules-NIROP operating facility. Third, Hercules allegedly has negligently and recklessly caused the condition which has created the nuisance and harmed the plaintiffs. Inasmuch as this court has determined that federal law is to govern the scope and nature of defendant's claim of derivative sovereign immunity, the earlier finding under *Utah* law that plaintiffs had failed to state a claim alleging that Hercules had been negligent is not determinative of this issue. Fourth, because Hercules is engaging in ultrahazardous operations, this court should follow the trend announced in *Smith v. Lockheed Propulsion Co.,* 247 Cal. App.2d 774, 56 Cal.Rptr. 128 (1967) and *Berg v. Reaction Motors Division, Thiokol Chemical Corp.,* 37 N.J. 396, 181 A.2d 487, 497 (1962), and restrict immunity on the grounds that a corporate profit is being made and the profits are derived from conducting ultrahazardous operations. Fifth, the harm and risk thereof, caused by Hercules' operations, are not the necessary and unavoidable consequence of the performance of the government contracts it has relative to the MX, Pershing II and Posiedon missile programs. For reasons which follow, this court finds as a matter of federal law the claims of the plaintiffs must fail

and defendant's claim to derivative sovereign immunity must stand.

First, any distinction made which would prevent Hercules as a second-tier contractor, or sub-contractor, to a DoD general contractor with the government, from receiving the benefit of derivative sovereign immunity would require this court to exalt form over substance. Assuming *arguendo* that the operations at Hercules are performed only as second-tier contractors on DoD contracts, there are several factors which make it manifestly obvious that Hercules, for purposes of derivative sovereign immunity, should be treated as one with direct contact with the government. Plaintiffs' arguments fail to take cognizance of the fact that the 520-acre Naval Industrial Reserve Ordnance Plant (NIROP) is an integrated part of the manufacturing process at Hercules. Some seventy full-time federal employees are involved at the operations. Furthermore, the United States holds title to the hazardous materials used in the operations when they arrive and receives title to the final, finished product before it leaves the facilities. Under these undisputed facts, and the observation the immunity in this case turns on questions of siting, any distinction as to the rights Hercules has to invoke the doctrine of derivative sovereign immunity because it is under some contracts a second-tier rather than first-tier contractor is de minimus.

Second, the plaintiffs' claim that sufficient government control does not exist in this case to allow Hercules to assert the doctrine of sovereign immunity must fail because the plaintiffs have mistakenly focused their review of government control to areas that do not deal with siting. The compliance of Hercules with the standards promulgated by the DDESB designed to eliminate any "undue risk" of injury to those, like plaintiffs, outside the facilities, is uncontested. For reasons cited in the court's earlier analysis of how under Utah law plaintiffs had not suffered a "substantial" injury and defendant Hercules was not acting "unreasonably," *supra,* this court finds that the standards promulgated by the DDESB and followed by Hercules were sufficient to comply with the mandate of eliminating "undue risk" of harm to those outside the Hercules-NIROP operations. As such, plaintiffs' efforts to contest the assertions of more extensive government control made in defendant's affidavits are not persuasive.

Third, plaintiffs' claim of negligent operations is insufficient on two grounds. First, for the reasons cited earlier in the analysis of the negligence question under *Utah* law, plaintiffs have failed to properly plead negligence as required by Rule 8(a) of the Federal Rules of Civil Procedure. Second, as matter of federal law, when a DoD contractor is involved in ultrahazardous manufacturing operations and conducts them in a manner required by the *minimum* safety standards promulgated by the DDESB, or other relevant military boards with similar discretionary powers, and suit is brought for damages caused by operations which give rise to a risk of explosion, *where no explosion has occurred,* the contractor has established sufficient compliance with government safety standards to prevent any alleged claim of negligence to deprive the contractor of its right to assert derivative sovereign immunity as a defense.

Fourth, this court rejects plaintiffs' urging to follow the trend under state law restricting the application of sovereign immunity when ultrahazardous operations are conducted for corporate profit. It does so for three reasons. First, as noted earlier, this court is not bound to follow state law as it relates to questions interpreting the sovereign immunity of the United States. Second, the very ultrahazardous nature of much of the DoD manufacturing contracts is what justifies the imposition of stringent safety requirements by the DDESB. To remove the defense of sovereign immunity in such a circumstance would nullify the effect of 10 U.S.C. Section 172 which "clearly constitutes a discretionary grant of sovereign power," being "anchored firmly to Art. I, Sec. 8, Clause 17 of the United States Constitution." *McQueary v. Laird, supra,* at 610, 612. Third, as many defense

contracts are handled on a cost-plus basis or have provisions allowing for equitable adjustments in price, the state concept urged by plaintiffs that would place the burden of insurance costs on the corporation instead of plaintiffs by reason of that profit in reality seeks to place the burden on the United States and its concerned taxpayers. Even if contrary to defendant's assertions Hercules could purchase insurance covering damages arising solely from the "risk of explosion" attendant the operations of Hercules-NIROP, this court declines to follow the state doctrine proffered by plaintiffs.

██ Fifth, plaintiffs' claim that the DDESB standards followed by Hercules allow for increased safety standards, and therefore *require* increased safety standards, must also be rejected. Plaintiffs have presented to the court instructions from the DoD Contractors' Safety Manual for Ammunition, Explosives and Related Dangerous Material, dated October, 1968, that authorize and encourage additional safety precautions.

> Operation distances are not absolutely safe distances but do provide relative protection. GREATER DISTANCES THAN THOSE SHOWN IN THE MANUAL SHOULD BE USED WHEREVER PRACTICABLE.

*Id.,* Section 705 at p. 7–3. Assuming *arguendo* that these regulations apply, the plaintiffs then claim that

> [t]he government regulations, therefore, not only allow for increased safety procedures and programs, but, in fact, authorize and encourage such precautions. In this instance, Hercules is free to increase its operation distances under the quantity distance table to achieve maximum protection and, likewise, is free to increase its barricading at the Bacchus plant. . . . Implementation of better protective measures could dramatically lessen the harm or risk thereof being inflicted upon plaintiffs' property. For reasons of cost and corporate profits, such increased safety measures have not been implemented. . . . The fact that Hercules' mode of operation is presently necessary

for its own convenience in performing its government contract should not and will not justify the extension of sovereign immunity to cover this wrongful conduct.

Memorandum of August 14, 1981, at 20. Placing aside the undisputed representations that Hercules has often exceeded the safety regulations promulgated by the DDESB, that Hercules has led the explosives industry in safety for the past twelve years, and that, apparently, the moving of the static testing site to Skull Valley was voluntarily done by Hercules and not required by the government, this court finds two reasons compel the conclusion that plaintiffs' argument is not sufficient to withstand this court's earlier recognition of Hercules' claim of derivative sovereign immunity.

First, federal precedent indicates that for reasons of public policy it is imperative that government contractors not be held liable if they choose to meet only minimum contract specification standards.

> The question of foreseeability of harm and the possible need to protect against it arose when the Government framed its terms. There is no charge that what the contractor did was not what it was required to do. Rather, it is that it was negligent in failing to provide some subsequent safeguard against the subsequent escape of fumes. Yet, as stated above, this was a decision which rested with the Government. The Government did not provide for such additional precautions in the plans, and the Western Contracting Corp. is not to be held liable for this omission. *See Myers v. United States,* 323 F.2d 580 (9th Cir.1963); *Merritt, Chapman & Scott Corp. v. Guy F. Atkinson Co.,* 295 F.2d 14 (9th Cir.1961); *Jemison v. Duplex,* 163 F.Supp. 947 (S.D.Ala. 1958). To impose liability on the contractor under such circumstances would render the Government's immunity for the consequences of acts in the performance of a "discretionary function" meaningless, for if the contractor was held liable, contract prices to the Government would be increased to cover the contractor's risk

of loss from possible harmful effects of complying with decisions of executive officers authorized to make policy judgments.

*Dolphin Gardens, Inc. v. United States of America and Western Contracting Corp.,* 243 F.Supp. 824, 827 (D.Conn.1965). This court finds this precedent persuasive in disposing of plaintiffs' claim that Hercules must increase its safety precautions in a manner desired by plaintiffs to avoid liability.

Second, and under these facts more important, the DDESB has been given the discretionary duty to determine *as a matter of public policy* the limits of safety requirements which must be established to prevent "undue loss of life or damage to property inside and outside" facilities such as those contained in the Hercules-NIROP manufacturing operations. *See* 32 C.F.R. Section 186.4(f). Any question as to what constitutes a risk of "undue loss" has already been delegated by Congress to the DDESB and not this court. Having found earlier that the DDESB had complied with its statutory and regulatory mandate, this court finds that as Hercules has complied with the safety and siting standards articulated by the DDESB, it does not have a legal duty to comply with additional safety standards which, from plaintiffs' perspective, would enhance the value and marketability of plaintiffs' property.

4. Defendants claim a lack of indispensable parties and the application of the Federal Tort Claims Act to this case.

■ The court agrees, as defendant suggests, that the United States and/or the NIROP should be made parties to this action. The United States is a real party in interest in this litigation. When the United States is a real party in interest, and its absolute sovereign immunity prevents a claim from being made, any questions as to indispensable parties are moot.

■ Defendant suggests that the Federal Tort Claims Act could apply in this case. The siting requirements discussed heretofore are premised on discretionary duties

and functions. *See McQueary v. Laird, supra,* at 610, 612. As such the Federal Tort Claims Act, 28 U.S.C. Section 2680(a), excepts them as a basis for suit. *See also Baca v. United States,* 467 F.2d 1061 (10th Cir.1972).

5. Plaintiffs' request for injunctive relief against Hercules is barred by reason of absolute sovereign immunity.

Absolute sovereign immunity bars plaintiffs' request for declaratory and monetary relief as well as their request for injunctive relief. In the third and sixth causes of action in their amended complaint, plaintiffs contend that "[i]n the interests of equity and public welfare, defendant should be enjoined from continuing to maintain the public nuisance described above." (Amended Complaint, paras. 46 and 68.) This court finds as a matter of federal law that the absolute sovereign immunity of the United States bars plaintiffs from bringing this claim even though the United States is not a named defendant in this action.

■ The general standard for determining whether an action is to be treated as one against the United States was summarized in the case of *Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963).

The general rule is that a suit is against the sovereign if "the judgment would expend itself on the public treasury or domain, *or* interfere with public administration." *Land v. Dollar,* 330 U.S. 731, 738 [67 S.Ct. 1009, 1012, 91 L.Ed. 1209] (1947), *or* if the effect of the judgment would be to "restrain the Government from acting, *or* compel it to act." *Larson v. Domestic and Foreign Corp.,* [337 U.S. 682] 704 [69 S.Ct. 1457, 1468, 93 L.Ed. 1628] [1949]; *Ex parte New York,* 256 U.S. 490, 502 [41 S.Ct. 588, 591, 65 L.Ed. 1057] (1921).

*Id.* 372 U.S. at 620, 83 S.Ct. at 1006 (emphasis added). Earlier court cases point out that it is not only the relief sought but also "the result of the judgment or decree which may be entered..." *Minnesota v. Hitchcock,* 185 U.S. 373, 387, 22 S.Ct. 650, 656, 46

L.Ed. 954 (1902); *cited* in *Larson v. Domestic & Foreign Corp., supra,* 337 U.S. at 687 n. 6, 69 S.Ct. at 1460 n. 6, that may be reviewed to determine if the United States is a party in interest. *See also Ogden River Water Users' Ass'n v. Weber Basin Water Conservancy,* 238 F.2d 936, 941 (10th Cir. 1956). This court, then, must determine if the injunctive relief sought, or the effect of any judgment or decree which could be entered under the plaintiffs' claim for monetary or declaratory relief, would come under one of the four standards enunciated in *Dugan v. Rank, supra.* The court finds that the uncontested facts of this case clearly indicate that the effect of a judgment in accord with plaintiffs' pleadings would fulfill all of the prohibitions announced in *Dugan, supra.*

In so ruling the court feels that two critical points in its reasoning need· to be articulated. First, the third and fourth prong of the *Dugan* test requires that the judgment would "restrain the Government from acting or compel it to act." Traditionally, an "[i]njunction is a remedy to restrain the doing of an injurious act, whereas mandamus commands the performance of a particular duty." *McQueary v. Laird, supra,* at 611. Nonetheless, the plaintiffs' seeking of declaratory and monetary relief also could come within the purview of *Dugan's* test prohibiting the compulsion or restraint of the Government. When the result of a judgment or decree as to declaratory or monetary relief would cause or be a substantial factor in motivating the United States to significantly change its present or anticipated governmental operations, that effect is sufficient to satisfy the prohibition against compelling or restraining the Government. *Dugan, supra.*

Second, when the Government would be thus affected, the question of who is to pay the monetary damages cannot be the sole test that is to be applied to determine if the United States is a real party. In *Stafford v. Briggs,* 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980), while construing Section 2 of the Mandamus and Venue Act of 1962, 28 U.S.C. Section 1391(e), Chief Justice Burger announced for a majority of the court as *dictum* a simplistic test which could be used to determine if, in fact, the United States was a party to an action. "In deciding whether an action is in reality one against the Government, the identity of the named parties defendant is not controlling; the dispositive inquiry is 'who will pay the judgment?'" *See Larson v. Domestic & Foreign Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). *Id.* 444 U.S. at 542 n. 10, 100 S.Ct. at 784 n. 10. This language does not change the fact that the doctrine of absolute sovereign immunity bars plaintiffs' claims for monetary and declaratory relief as well as injunctive relief. The litmus test articulated in *Stafford, supra,* fails to recognize that *Larson* only allows this simplistic approach when not only are monetary damages restricted to the defendant but "[t]he judgment sought will not require action by the sovereign or disturb the sovereign's property." *Larson v. Domestic & Foreign Corp., supra,* 337 U.S. at 687, 69 S.Ct. at 1460. Were plaintiffs to be granted the relief they seek in this case it would clearly (1) require action by the sovereign in reviewing the reasonableness of the safety standards promulgated by the DDESB,[19] (2) require a halt to joint manufacturing operations conducted at Hercules-NIROP,[20] and (3) require the possible removal of the $3,000,000 worth of severable equipment that the Government has invested in severable equipment on Hercules' property. These results do not even take into account the $15,000,000 that the Government has

---

**19.** Any ruling by this court recognizing the validity of plaintiffs' nuisance claims would, *ipso facto,* constitute a ruling that the regulations of the DDESB did not eliminate the "undue risk" attending the Hercules-NIROP operations as required by 10 U.S.C. Section 172, 32 C.F.R. Section 186.4(f). It is obvious that such a ruling would require major alterations and contingency plans in the present and future positioning of manufacturing facilities where DoD contractors use ultrahazardous materials.

**20.** *See* Affidavit of Ernest A. Mettenet, Jr., November 17, 1980, para. 7.

invested in NIROP.[21] Under these facts the test announced in *Stafford, supra,* does not apply. Absolute sovereign immunity, therefore, has application to plaintiffs' claims for declaratory and monetary relief. In all events, plaintiffs' claims for monetary and declaratory relief are barred by the doctrine of derivative sovereign immunity.

In light of the foregoing, the court finds that the granting of the injunctive relief sought by plaintiffs would clearly satisfy all of the four-prong tests announced in *Dugan, supra.* First, the removal of the $3,000,000 worth of severable Government property on Hercules property and the disruption of the $15,000,000 investment the Government has in NIROP would clearly affect the public treasury. Second, the enjoining of operations which had been in compliance with DDESB safety standards on the grounds that the risk of injury was so great as to constitute a nuisance would clearly disrupt the public administration of Hercules' contracts and those of any other contractor elsewhere in the nation who was sued on the grounds that it constituted a public nuisance or unjustified risk, notwithstanding compliance with federal safety standards. Third, for reasons heretofore outlined, such action would restrain the Government's ability to act with Hercules as to continued production of the MX, Posiedon and Pershing II missile systems. Fourth, for reasons heretofore outlined, such action would compel the Government to act in ways that are inconsistent with ongoing or planned essential defense operations. Such burdens would impede the efforts of the United States to fulfill its constitutional mandate of "provid[ing] for the common defense," U.S. Constitution Preamble, and the inherent responsibilities of the

sovereign. For all these reasons, plaintiffs' third and sixth causes of action seeking injunctive relief are barred by the absolute sovereign immunity of the United States.

For all of the foregoing, the court finds that all of plaintiffs' causes of action relating to nuisance fail to state a claim upon which relief can be granted by reason of the derivative sovereign immunity asserted by Hercules and the absolute sovereign immunity of the United States. Reliance on materials outside the pleadings in making such a finding, as requested by the parties, permits the granting of defendant's motion for summary judgment as to plaintiffs' first six causes of action. The court will next consider the plaintiffs' seventh cause of action seeking relief from damages allegedly caused by defendant's maintenance of an ultrahazardous activity.

II. Have the plaintiffs made out a claim for damages arising from strict liability imposed upon the defendant for ultrahazardous operations?

A. Plaintiffs have failed to state a cause of action under Utah law.

■ Plaintiffs' amended complaint propounds the following syllogism to support their claim for damages, because of the continued maintenance of the Hercules plant adjoining their property.

Defendant owes to plaintiffs the duty of care not to cause injury to plaintiffs' property, including the duty not to diminish the value of plaintiffs' "property."

Defendant's maintenance of the abnormally dangerous activities being conducted on its plant actually and proximately causes injury to plaintiffs' "property," including its diminution of its value.

**21.** *See* Letter of Commander G.F. Wendt, USN to Mr. Carl Dinus, Federal Housing Administration [Salt Lake City] Office, *supra,* footnote 3. The court's earlier finding, (e.g. that on summary judgment it need not recognize the factual conclusions of military personnel that a program is then "critical to national defense" when claimed without additional reference to a specific political determination of that fact) does not question the necessity—hence, legal propriety—of accepting undisputed representa-

tions of such individuals as to the impact certain actions may have on the operations they currently supervise. Nonetheless, sensitive discovery and constitutional issues arise when the military personnel present conclusions based on classified materials which are usually removed from the domain of civil discovery. *Weinberger v. Catholic Action of Hawaii, supra; United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953).

Defendant is strictly liable to plaintiffs for all injury which its abnormally dangerous activities cause to plaintiffs' property.

(Amended Complaint, paras. 70–72.) A review of the entire complaint indicates that the diminution of the value of the land occurs because the activities of Hercules "create a risk or threat of accidental explosions capable of causing injury and damage to the surrounding properties." (Amended Complaint, para. 19.) "This risk or threat significantly interferes with the use and enjoyment by members of the community of property surrounding the defendant's plant, causing persons nearby the plant to forego normal use and enjoyment of the surrounding property due to the fear and danger caused by this risk or threat." (Amended Complaint, para. 20.) An examination of relevant Utah law indicates that these claims do not stand as the damage complained of could not be reasonably anticipated by defendant. No explosion occurred and plaintiffs' alleged damage was primarily caused by a "mental" rather than physical condition.

*Madsen v. East Jordan Irr. Co.,* 101 Utah 552, 125 P.2d 794 (1942) dealt with an action brought by a mink farmer against those who used dynamite on an adjoining piece of property to repair an irrigation canal. The blast of explosives frightened the mother mink and allegedly caused 108 of them to kill 230 of their "kittens" or offspring. Apparently, by nature, habit and disposition, mink are highly excitable when attending their young, and when disturbed will become terrified and kill their offspring. Notwithstanding the fact that the blasting occurred only 100 yards away from the plaintiff's property, the Utah Court denied plaintiff's claim.

[I]t impresses one with the thought that he who fires explosives *is not liable for every occurrence following the explosion which has a semblance of connection to it. . . .* Whether the cases are concussion or nonconcussion, the results chargeable to the nonnegligent user of explosives are those things *ordinarily resulting* from an explosion. Shock, air vibrations, thrown missiles are all illustrative of the *anticipated* results of explosives; *they are physical as distinguished from mental in character.*

*Id.* at 795 (emphasis added). Obviously, if one who sets off explosives is not liable for all the damage that has a semblance of connection to it, *a fortiori,* one merely working with such materials, without any explosion, would not be held liable.

At oral argument plaintiffs' counsel claimed that the existence of an "over blast pressure area" surrounding the Hercules facilities gave rise to the fear of explosion and the decision by the Zoning Commission to halt further residential development near the plant. Plaintiffs claim that even if development were allowed, the existence of this over blast pressure area would require them to sell their homes at a lower price than those homes outside the area. As pled and argued, plaintiffs' claims are not cognizable under Utah law as articulated in *Madsen, supra. Madsen* requires plaintiffs to show that the injury to them is a physical injury ordinarily resulting from the activities of the defendant. This they have failed to do. In light of plaintiffs coming to the vicinity long after the manufacturing operations were producing volatile fuels and rocket motors, any damage incurred as to them by the existence of a potential "over blast pressure area" is not that which ordinarily results from the ongoing activity of defendant Hercules.[22] Absent any explosion, the injury complained of is mental

---

**22.** Inasmuch as there has been no explosion causing plaintiffs' property or their persons to be directly affected by debris, explosion or shock waves, plaintiffs' claimed damage is not that which normally arises by reason of ultrahazardous activities. Utah law has never allowed for recovery when plaintiffs' injuries are not subsequent to an explosion of some kind.

See *Southwick v. S.S. Mullen, Inc.,* 19 Utah 2d 430, 432 P.2d 56 (1967); *Robinson v. Robinson,* 16 Utah 2d 2, 394 P.2d 876 (1964); *Matievitch v. Hercules Powder Co.,* 3 Utah 2d 283, 282 P.2d 1044 (1955); *Skerl v. Willow Creek Coal Co.,* 92 Utah 474, 69 P.2d 502 (1937); *Smith v. Mine & Smelter Supply Co.,* 32 Utah 21, 88 P. 683 (1907).

rather than physical.[23] For these reasons, plaintiffs' claim is not recognized under Utah law.

**B. Federal law similarly bars jurisdiction over this matter by reason of sovereign immunity.**

Title of all hazardous materials used at the Hercules plant lies with the United States Government.[24] If the hazardous material owned by the United States were not at the plant, there would be no claim of ultrahazardous activity. Therefore, any claim for damages arising from ultrahazardous operations must, of necessity, impact upon and affect the United States. Plaintiffs' claim is clearly directed against the rights and interests of the United States as well as Hercules.

The Supreme Court has clearly held that there is no express or implied authorization that allows the bringing of suits against the United States under a doctrine of strict liability. *Laird v. Nelms,* 406 U.S. 797, 803, 92 S.Ct. 1899, 1902, 32 L.Ed.2d 499 (1972); *Dalehite v. United States,* 346 U.S. 15, 45, 73 S.Ct. 956, 972–73, 97 L.Ed. 1427 (1953). Inasmuch as the United States has not consented to suit under a strict liability theory, absolute sovereign immunity bars jurisdiction. *Ogden River Water Users' Ass'n v. Weber Basin Water Conservancy, supra,* at 941.

The earlier analysis of Utah law as to defendant's liability assumed plaintiffs' contention that Hercules' operations constituted an ultrahazardous activity. As a matter of federal law, this fundamental premise of plaintiffs' claim is not present. The mere existence of a long-term manufacturer engaged in the production of component parts necessary for national defense does not give rise to strict liability for engaging in ultrahazardous activity unless there is an explosion or physical trespass on adjoining property. A risk of future explosion or a tangible "over blast pressure area" does not constitute such a trespass. Therefore, for these reasons, and those stated earlier under derivative sovereign immunity and nuisance, the plaintiffs have failed to state a cause of action over which this court has jurisdiction.

**III. The causes of action relative to fraudulent misrepresentation will stand.**

On March 31, 1982, the court entered an order granting defendant's motion for summary judgment because the undisputed facts and the substantial legal reasons cited to the court by the movant seemed to compel such a result. At that time the court reserved the right to file a memorandum opinion detailing the reasons for the court's ruling.

As the court was preparing its memorandum opinion detailing the rationale for the earlier order, it found it was not fully satisfied that the precedent of *Wright Development Corp. v. City of Wellsville,* 608 P.2d 232 (Utah 1980) denied plaintiffs the right to claim injury based on representations made by Hercules *to them* or those represented *to them* by staff members of the Zoning Commission as to statements and positions taken by Hercules at earlier zoning meetings. Because of this uncertainty and the factual ambiguity as to the time, location and substance of representations allegedly made *outside* actual zoning hearings, the court is persuaded that the plaintiffs' final four causes of action must be allowed to stand at this time so that further discovery may clarify the inferences that

---

**23.** The deterrent factor that fear of explosion may have on the development and sale of plaintiffs' property is mental rather than physical in nature. As such, like the mink mother's reaction in killing her kittens, this fear constitutes an intervening cause and breaks the chain of causation. The plaintiffs' speculative profits to be derived from development and subsequent sales are just as much lost to them as was farmer Madsen's anticipated profits from the sale of the kittens which were killed as a direct response by their mothers to the explosion of dynamite on the adjoining property. As Madsen was denied the right to recover, when there was an explosion, *a fortiori,* plaintiffs, who claim no explosion, must be denied recovery.

**24.** Affidavit of Ernest A. Mettenet, Jr., November 17, 1980, para. 9. Affidavit of G.W. MacPherson, November 17, 1980, para. 5.

may be drawn from plaintiffs' materials presently before the court.

Except for the above conclusion as to plaintiffs' final four causes of action, this opinion details the rationale supporting the March 31, 1982, order. Having articulated the basis of the order, the plaintiffs' motions for reconsideration, clarification and oral argument will be denied.

For the reasons noted above, the court will file an amended order correcting the one entered March 31, 1982, by denying the granting of defendant's motion for summary judgment as to the plaintiffs' eighth, ninth, tenth and eleventh causes of action in plaintiffs' amended complaint, denying the motions to reconsider, clarify and to make oral argument, and confirming the rest of the order.